IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|   |   |
|---|---|
| THE PAMPERED CHEF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 10 C 1399 |
| ) | |
| SANDY ALEXANIAN, DON FUNT, ) | |
| CHRISTINE LAURICH, LORI MITCHELL, ) | Magistrate Judge Jeffrey Cole |
| VALERIE NEWTON, and SHANNON PELL, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

One of the defendants, Sandy Alexanian, used to work for the plaintiff as a sales representative. As part of her employment, she signed an agreement that precluded her from recruiting plaintiff's sales people to work for a competitor for two years after she left plaintiff. The agreement also contained a confidentiality provision regarding trade secrets. Ms. Alexanian left the plaintiff in February 2010, but had discussions with her new employer, Jewels by Park Lane, as early as October 2009. According to plaintiff, she began recruiting plaintiff's sales representatives for Park Lane before she resigned her position with plaintiff. Plaintiff also claims she misappropriated its trade secrets.

Thereafter, defendants Donald Funt, Christine Laurich, and Valerie Newton followed Ms. Alexanian to Park Lane. Plaintiff has sued them for breaching the non-solicitation and confidentiality provisions in their employment agreements. It has added Lori Mitchell and Shannon

Pell, Park Lane employees, who, it claims, tortiously interfered with its contracts with its sales force.

The Pampered Chef seeks an order compelling Joyce Salela, a third-party witness, to answer certain deposition questions concerning conversations she had in the presence of her counsel, Dan Feeney, and the defendants' counsel, Jonathan Cyrluk, at the time she was preparing for her deposition in this case. The central thesis of the motion to compel is that the discussions between Ms. Salela, Mr. Feeney, and Mr. Cyrluk are discoverable because the confidential protections afforded by the attorney-client privilege are waived when an otherwise-privileged conversation takes place in the presence of a third-party. It is Ms. Salela's contention that the privilege was not waived because she and the defendants had a "common legal interest" agreement, and thus, the protections of the attorney-client privilege extended to her pre-deposition discussions with Mr. Feeney and Mr. Cyrluk. The plaintiff's ancillary argument is that Ms. Salela's testimony regarding some "chit chat" she had with Mr. Cyrluk waived whatever privilege might have existed as to all other conversations. Although not formulated this way, the argument in essence is that testimony about information that is not privileged waives the privilege as to all that is. To borrow one of Justice Frankfurter's *bon mots*, "[t]his is a horse soon curried." *Olberding v. Illinois Cent. R. Co.,* 346 U.S. 338, 340 (1953).

## FACTUAL BACKGROUND

### A.

The Pampered Chef is a direct seller of essential kitchen tools whose products are sold primarily through in-home cooking demonstrations known as "Cooking Shows." (Complaint ¶ 12). At each of the shows, products are demonstrated and sold by a member of The Pampered Chef's sales team, which is comprised of more than 60,000 independent consultants working mainly on a commission and incentives basis. (*Id.*). Consultants and attendees prepare and serve dishes

showcasing The Pampered Chef's products, as well as its proprietary recipes. This kind of sales strategy is alleged to be highly effective, often inspiring customers and hosts to become Pampered Chef consultants. The system's success is said to depend on repeat business, grassroots marketing, and the strength of the consultants' relationships with the company's customer base. Consequently, the company values as protectable assets and trade secrets the identities and contact information of its customers, as well as its sales field members. (*Id.* at ¶ 13-15).

The Pampered Chef initially brought this suit only against Sandy Alexanian, a former Pampered Chef sales director, who left the company in 2010 to join Jewels by Park Lane, a direct seller of jewelry retailer, whose products are sold primarily through in-home jewelry shows. (Salela Response to Motion to Compel at 2). In its complaint, The Pampered Chef alleged that Ms. Alexanian violated the express terms of her written Independent Sales Director Agreement, in which she had agreed she would not (1) disclose any of The Pampered Chef's confidential, proprietary information and trade secrets for two years; and (2) solicit or recruit any members of The Pampered Chef's sales force to sell products or services for any other company for two years. (Complaint ¶ 1). The complaint accused Ms. Alexanian of misappropriating Pampered Chef trade secrets and breaching her Director Agreement by accessing the contact information of Pampered Chef sales force members, and "attempt[ing] to...solicit and recruit Pampered Chef consultants to join Park Lane as sales representatives." (*Id.* at ¶ 5, 42).

After filing the complaint, The Pampered Chef's lawyers deposed three other members of Park Lane's sales team – including now-defendants Don Funt and Christine Laurich – who had previously been directors at The Pampered Chef. (Salela Response 2). During those depositions, counsel for the plaintiff asked the witnesses questions regarding the Director Agreements they had

3

signed with Pampered Chef and their own compliance with those agreements. (*Id.*; Salela Response, Ex. C). At one point during Mr. Funt's deposition, his attorney expressed concern that plaintiff's counsel seemed to be framing his questions in an attempt to "somehow build a case against [Mr. Funt]." (Salela Ex. C at 40). Plaintiff's counsel responded that his questioning was "legitimate" and "may well lead to additional relevant evidence not only against Sandy Alexanian but others." (*Id.* at 41). Shortly after their depositions were taken, The Pampered Chef amended its complaint to add Mr. Funt and Ms. Laurich as defendants, accusing them of the same contractual and fiduciary breaches it had asserted against Ms. Alexanian. (Amended Complaint ¶ 70, 89).[1]

**B.**

On August 4, 2010, plaintiff's counsel deposed Ms. Salela, who is not a party. (Motion to Compel 1)(" Motion"). Like Ms. Alexanian, Mr. Funt, and Ms. Laurich, Ms. Salela had previously been a Pampered Chef director, signed the same Director Agreement, and is currently affiliated with Park Lane. (Salela Response 3). During the questioning, plaintiff's counsel came to learn that Ms. Salela had met with her retained counsel, Mr. Feeney, in preparation for her deposition, and that the defendants' attorney, Mr. Cyrluk, was also present for a portion of that meeting. (Motion 1; Plaintiff's Ex. A at 19-20).[2] When Ms. Salela was asked specifically about what had been discussed in that meeting, Mr. Feeney objected on the basis that the question "call[ed] for privileged communications." (Plaintiff's Ex. A at 20).

---

[1] The amended complaint also names two other defendants – Lori Mitchell and Shannon Pell – who are both charged with tortiously interfering with The Pampered Chef's Sales Director Agreements through their involvement in soliciting and recruiting Pampered Chef directors to join Park Lane. (Amended Complaint at ¶ 2, 107, 114).

[2] Both Mr. Feeney and Mr. Cyrluk were also present during Ms. Salela's deposition.

4

Plaintiff's counsel expressed his belief that "the privilege was broken by virtue of Mr. Cyrluk being present for the meeting," to which Mr. Feeney responded that Ms. Salela and the defendants had reached a written "joint interest agreement," which protected the communication despite Mr. Cyrluk's presence. Plaintiff's counsel then requested to see the agreement, but Mr. Feeney stated that he did not have a copy with him, and instructed Ms. Salela not to answer the question. (*Id.* at 21-23).

The attorneys continued to debate the privilege issue, and following a short recess, Ms. Salela was again asked questions regarding the conversation she had while in the presence of Mr. Feeney and Mr. Cyrluk. (*Id.* at 25-29). Ms. Salela answered the questions, but she did so in general terms, and without disclosing the specific contents of any communication she had with her attorney or Mr. Cyrluk during the course of her deposition preparation. Her complete description of the conversation with Mr. Cyrluk was as follows: "We were talking about lunch. It was just sort of general not to worry have I been deposed before. I mentioned, you know, my background and different businesses that I was in. It was just kind of more of a general chitchat. I can't think of anything real specific." (Salela Response, Ex. F at 30). She stated that, "[i]t was a very short period of time, twenty minutes, had a sandwich, hi, how are you." (*Id.* at 31). Ms. Salela's sur-reply explains that she and Mr. Feeney met for purposes of deposition preparation, and the preparation session recessed for lunch when Mr. Cyrluk arrived. (Sur-Reply at 3). During the lunch break, she and Mr. Cyrluk engaged in small-talk over sandwiches, which she described as non-substantive "chitchat." (*Id.*). The conversation ended when the deposition preparation recommenced, and Mr. Cyrluk observed for several minutes before departing. (*Id.*).

5

The day after Ms. Salela's deposition, Mr. Feeney turned over a copy of the common interest agreement to plaintiff's counsel. The parties to the agreement are Jewels by Park Lane, Inc., Sandy Alexanian, Don Funt, Christine Laurich, Lori Mitchell, Valerie Newton, Shannon Pell, Grace Calderon, Joyce Salela, and Sybil Goade. (See Plaintiff's Ex. B). The agreement states in pertinent part:

> [T]he Parties have mutually concluded that their respective interests will be best served by a common and join investigation and defense of their common interests in connection with the Claims, thereby protecting the privileges and other protections that otherwise might arguably be waived in the absence of this Agreement.

(*Id.* at 2).

The parties intended for the agreement to cover "[a]ny oral communications" between or among any counsel and/or any of the parties to the agreement. (*Id.* at 4). And although the agreement states that the parties share a common interest presently, it also recognizes that adverse interests may arise in the future:

> Prior to entering into this Agreement, each Party has been fully advised by her, his or its counsel of the possibility that the other Party, or an individual associated therewith, could later become witnesses against that Party or take positions adverse to that Party.
>
> \*\*\*
>
> Each Party acknowledges that...her, his or its counsel has informed her, him or her of the general nature of certain conflicts that might arise. The common interest privileges described herein and recognized by this Agreement, and any other applicable privileges, doctrines and protections from disclosure, shall not be destroyed or impaired...and in fact are specifically preserved...if adversarial relationships subsequently arise between the parties.

(*Id.* at 5).

6

# ANALYSIS

## A.

The attorney-client privilege is the oldest of the recognized privileges for confidential communications known to the common law. *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996); *Upjohn Co. v. United States* 449 U.S. 383, 389 (1981). Deeply rooted in public policy, *In re Ford Motor Co.*, 110 F.3d 954, 966 (3d Cir.1997), and playing a "vital role" in the administration of justice, *American Nat. Bank and Trust Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 878, (7th Cir.2005), it remains one of the most carefully guarded privileges and is not readily to be whittled down. *See Swidler & Berlin v. United States*, 524 U.S. 399, 403(1998).[3] The privilege's central concern – and its ultimate justification – is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice. Without that frankness, sound legal advice is impossible, and without informed advice, the ultimate goal of the attorney-client privilege is unattainable. *Upjohn*, 449 U.S. at 389.

But the privilege, like all testimonial privileges and all exclusionary rules, comes at a price. Since it makes the search for truth more difficult by preventing disclosure of what is often exceedingly relevant information, it is strictly construed and is limited to those instances where it is necessary to achieve its purposes. *University of Pennsylvania v. EEOC*, 493 U.S. 182, 185 (1990); *Fisher v. United States*, 425 U.S. 391, 403(1976); *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir.

---

[3] *Compare United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989)(the attorney-client privilege is often "[n]arrowly defined, riddled with exceptions, and subject to continuing criticism."). Bentham was perhaps the most acerbic and unrelenting critic of the privilege. *See* VIII Wigmore, Evidence, § 2291 at 549 (McNaughton rev.1961).

2007); *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)(scope of privilege should be "strictly confined within the narrowest possible limits").

The protection of the privilege extends to *confidential* communications made by a client to his lawyer "[w]here legal advice of any kind is sought ... from a professional legal advisor in his capacity as such." *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000). *See also United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir.1997) ( *quoting* 8 John Henry Wigmore, Evidence in Trials at *415 Common Law § 2292 (John T. McNaughton rev.1961)).[4] Thus, "knowing disclosure to a third party almost invariably surrenders the privilege," *Burden-Meeks*, 319 F.3d at 899; *In re Pebsworth*, 705 F.2d 261, 263 (7th Cir. 1983), and as a general rule, statements made to one's attorney in the presence of a third person are not within the scope of the attorney-client privilege. *Jenkins*, 487 F.3d at 490; *Evans*, 113 F.3d at 1462. This is so despite the client's subjective intention not to waive the privilege. *Jenkins*, 487 F.3d at 490; 8 Wigmore, Evidence § 2327.

## B.

But like all general rules, this one has its exceptions. Where a client communicates with his attorney in the presence of a third person who shares either a common legal interest, the attorney-client privilege is not waived as to the information that is exchanged. *Evans*, 113 F.3d at 1461. Parties may assert a common interest where they have an identical – not merely similar – legal interest in the subject matter of a communication and the communication is made in the course of

---

[4]The privilege is limited to situations in which the attorney is acting as a legal advisor. Business advice is not protected. *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir.2003). Although the privilege is deemed generally to apply only to communications by the client, statements made by the lawyer to the client will be protected where those communications rest on confidential information obtained from the client, or where those communications would reveal the substance of a confidential communication by the client. *Rehling*, 207 F.3d at 1019.

furthering the ongoing, common enterprise. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007). "Although occasionally termed a privilege itself," this common interest rule is really an "exten[sion] [of] the attorney-client privilege to otherwise non-confidential communications in limited circumstances." *BDO Seidman*, 492 F.3d at 815. The rule protects "the free flow of information from client to attorney...whenever multiple clients share a common interest about a legal matter." *United States v. Schwimmer*, 892 F.2d 237, 243-44 (2nd Cir. 1989). The common interest must relate to a legal matter, (not one that is solely commercial), though it need not relate to litigation *per se*. *In re Sulfuric Acid Antitrust Litigation*, 235 F.R.D. 406, 416-17 (N.D. Ill. 2006).

The common interest doctrine originally developed in criminal cases, as a "joint-defense privilege," where two or more co-defendants are frequently represented by a single attorney. *In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129*, 902 F.2d 244, 248 (4th Cir. 1990); *United States v. McPartlin*, 595 F.2d 1321, 1326 (7th Cir.), *cert. denied*, 444 U.S. 833 (1979); *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985). Recognizing that "[c]ooperation between defendants in such circumstances is often not only in their own best interests but serves to expedite the trial or...the trial preparation," *McPartlin*, 595 F.2d at 1337, the common interest rule has been extended in a wide range of circumstances, frequently those involving civil co-defendants, companies individually summoned before a grand jury, potential co-parties to prospective litigation, plaintiffs filing separate actions in different states and civil defendants who were sued in separate actions. *In re Grand Jury Subpoenas*, 902 F.2d at 249 (collecting cases).

Today, the doctrine applies broadly to civil litigation and includes situations where clients share a common legal interest but are represented by separate attorneys. *BDO Seidman*, 492 F.3d at 816; *In re Grand Jury Subpoenas*, 902 F.2d at 249; *Haines v. Liggett Group, Inc.*, 975 F.2d 81,

90 (3rd Cir. 1992). *Keplinger*, 776 F.2d at 701; *Evans*, 113 F.3d at 1466-67 (noting that the joint defense privilege is more aptly referred to as the common interest doctrine). The doctrine encompasses communications made in the presence of third parties where the parties are coordinating a defense strategy or pooling information for a common legal purpose.

Although originally limited in application to co-defendants, the Seventh Circuit permits both potential parties and parties who are not otherwise joined in litigation to assert the "common legal interest" privilege, even where it is not anticipated that the party will be sued in the future. *BDO Seidman*, 492 F.3d at 816, n.6.[5] This view is adopted in the Restatement of The Law Governing Lawyers, which states: "If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged...that relates to the matter is privileged as against third persons." Restatement (Third) of The Law Governing Lawyers § 76. This position serves the main purpose of the rule, which is to preserve the confidentiality of communications ordinarily outside the scope of the attorney-client privilege, where a common legal

---

[5] The privilege does not require that the interest be in litigation or that litigation be actual or imminent for communications to be privileged. *BDO Seidman*, 492 F.3d at 816 n.6; *see Evans*, 113 F.3d at 1467. So, the fact that Ms. Salela is not a defendant in this case – which plaintiff suggests scotches the common interest doctrine (Salela Dep., at 27-28) – does not matter. *Cf., In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir.1997) (If two or more clients with a common interest in a litigated or a non-litigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged ... that relates to the matter is privileged as against third persons); *United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir.1996); *Evergreen Trading, LLC ex rel. Nussdorf*, 80 Fed.Cl. 122, 143 -144 (Fed.Cl.2007). Nor does it matter that Mr. Cyrluk is not Ms. Salela's attorney. *See United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir. 1979)(quoting Advisory Committee's Note to proposed Fed.R.Evid. 503(b)("The third type of communication occurs in the "joint defense" or "pooled information" situation, where different lawyers represent clients who have Some [sic] interests in common . . . ."). *See also United States v. Schwimmer*, 892 F.2d 237, 243 (2nd Cir. 1989); 3 Weinstein's Federal Evidence, 503.21[2] (2d ed.2002).

interest or defense strategy has been decided upon and undertaken by the parties and their respective counsel. *Evans*, 113 F.3d at 1467; *Keplinger*, 776 F.2d at 701.

## C.

All of the individuals who signed the written, common interest agreement now work for Park Lane, which is also a signatory. Some of them formerly worked for the plaintiff, but a few did not. Some are defendants here; others are not. The agreement indicates that plaintiff has threatened Park Lane and the individuals who are not yet named as defendants with claims similar to those pending in this case. The three individuals who have not been named defendants have been subpoenaed. Ms. Salela sold kitchenware for the plaintiff and left, along with some of the defendants herein, to sell jewelry for Park Lane. She had the same contract with the same prohibitions about soliciting plaintiff's sales people and misappropriating trade secrets. Even absent any written agreement, there is a real potential for Ms. Salela to be sued. In fact, the plaintiff has announced its plan to file a motion to amend its complaint to add two more Park Lane employees.

During Ms. Salela's deposition, plaintiff's counsel targeted information regarding whether she had personally engaged in the same or similar conduct as charged in the Amended Complaint. (Salela Ex. F). Considering the undeniable similarities between Ms. Salela and the current defendants, not to mention the fact that The Pampered Chef has previously added other correspondingly-situated third-party deponents as defendants to the suit, it would seem that Ms. Salela may well be next – although perhaps in a state court action, not in this suit, since her presence would destroy diversity. Indeed, Pampered Chef does not rule this out as a possibility in either its motion or its reply brief. Park Lane is paying her legal fees. And, whether Ms. Salela is added to this case or not, her common interest – memorialized in the July 14 Common Interest Agreement

(See Salela Response Ex. B) – is in a narrow construction of the contractual and fiduciary obligations under the Pampered Chef's Director Agreements. (Salela Response 7).

As a former Pampered Chef director, Ms. Salela further shares in the defendants' interest in preventing entry of an injunction that would effectively restrict her employment opportunities and their scope. (*Id.*). Ms. Salela is in an essentially identical position as the named director defendants, in that she had signed the same Pampered Chef Director Agreement before eventually leaving the position for employment with Park Lane. That agreement now forms the basis for the claims asserted and the relief sought in The Pampered Chef's lawsuit. As a result, the present litigation stands to directly affect Ms. Salela's rights and obligations under the Pampered Chef's Director Agreement. In short – and regardless of the fact that Ms. Salela is not, herself, in the lawsuit – it is clear that she and the defendants share a sufficiently common legal interest.

The plaintiff contends that the parties to the agreement might one day become adversaries. And so they might. But as Judge Cardozo wrote famously in another context, "such a calculus of [possibilities] is beyond the science of the chancery." *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 547 (N.Y. 1928). However, the potential for adversity adheres in many situations. It is one that the common interest agreement in this case recognizes, [6] (See Motion 7; Plaintiff's Reply 3-4), as does the common interest doctrine, itself. Hence the rule that communications are not privileged in a subsequent controversy between the original parties. *Simpson v. Motorists Mut. Ins. Co.*, 494 F.2d 850, 855 (7th Cir. 1974). More importantly, the possibility of future discord between the parties is

---

[6] The plaintiff explains that the parties might one day line up on opposite sides of the question of who solicited whom. The individuals who formerly worked for the plaintiff might say that they were the ones induced to leave by Park Lane and Park Lane's employees and that they didn't induce anyone to go with them.

analytically irrelevant to the current alignment of their interests. It is enough that the parties presently share a common interest. *Cf., In re Total Containment, Inc.*, 2007 WL 1775364, 6 (Bkrtcy E.D.Pa.2007)("'A common legal interest exists where the parties asserting the privilege were co-parties to litigation or reasonably believed that they could be made a party to litigation.'").

Whatever an uncertain future may hold, for now, the various interests are not, as plaintiff would have it, "decidedly antagonistic." (Plaintiff's Reply at 4). Quite the contrary. In any event, the common interest doctrine as explicated by the Seventh Circuit "is not limited to situations in which the positions of the parties are compatible in all respects . . . ." *McPartlin*, 595 F.2d at 1336. *See also, Grochocinski v. Mayer Brown Rowe & Maw LLP*, 251 F.R.D. 316, 327 (N.D. Ill. 2008)("The common interest rule is not limited to parties who are perfectly aligned on the same side of a single litigation, rather the party asserting the privilege must simply demonstrate actual cooperation toward a common legal goal...."); *Matter of Quantum Chemical/Lummus Crest*, 1992 WL 71782, 3 (N.D.Ill. 1992)("This doctrine applies even where the interests of the conferees are not compatible in all respects. [citing *McPartlin*].").

*Verigy U.S., Inc. v. Mayder*, 2008 WL 5063873 (N.D.Cal. 2008) does not require a different result. There, Verigy sued Mayder, a former employee, for misappropriation of its intellectual property. A third party, and former employee of Verigy's predecessor, reportedly helped Mayder form his new company, but maintained that he, not Mayder or Verigy, was the owner of the disputed intellectual property. Nevertheless, he entered into a common interest agreement with Verigy, and they shared certain documents that Mayder wanted in discovery. 2008 WL 5063873 *1. The magistrate judge found that there was no common interest between Verigy and the third party. He noted that the third party had earlier disavowed any such common interest, consistently claimed

ownership over the intellectual property – in direct conflict with Verigy – and that the third party might be testifying under a legal threat from Verigy.

The court found that the common interest between Verigy and the third party came down to a shared desire to see Verigy win its case against Mayder, which Verigy admitted was simply a case of "the enemy of my enemy is my friend." He also rejected the notion that Verigy and the third party shared their interests in the intellectual property, which was a completely different position than the third party had previously espoused. Finally, he explained that any other common interest the two might have in continuing to conduct a cordial business relationship was a commercial, not a legal, interest. 2008 WL 5063873 *3. Here, Ms. Salela is not asserting any interest adverse to Park Lane in terms of trade secret ownership. Her common interest with the defendants is obviously far more than a case of "the enemy of my enemy is my friend." Ms. Salela works for Park Lane. There is also the element of the non-solicitation clause in this case that was absent in *Verigy*. Truly, the only real similarity is that, like Verigy and the third party, Ms. Salela and Park Lane share a commercial interest in the disputed trade secret or, as in *Verigy*, the intellectual property.

In *BDO Seidman*, the Seventh Circuit explained that the common interest exception applies to a range of communications to encourage "parties with a shared legal interest to seek legal 'assistance in order to meet legal requirements and to plan their conduct' accordingly." 492 F.3d at 815. That sums up what is going on here, even if there is a partial aspect or component as well.

**D.**

Finally, The Pampered Chef argues that even if Ms. Salela and the defendants share a valid common interest, her "disclosure of…communications in Mr. Cyrluk's presence broke the privilege

14

and rendered the privilege waived." (Motion at 6). The "disclosure" to which the plaintiff refers is Ms. Salela's testimony regarding a lunch conversation following her deposition preparation where she, Mr. Feeney and Mr. Cyrluk engaged in non-substantive "chitchat" over sandwiches. (See Salela Ex. F at 30):

> Q: How long during the course of your meeting with Mr. Feeney was Mr. Cyrluk present?
>
> A: Just a few minutes. He came in for lunch. ... 20 minutes.
>
> \* \* \*
>
> Q: Tell me what, if anything, Mr. Cyrluk said to you during the course of the meeting when he was present with you and Mr. Feeney?
>
> \* \* \*
>
> A: We were talking about lunch. It was just sort of general not to worry, have I been deposed before. I mentioned, you know, my background and different businesses that I was in. It was just more kind of general chitchat. I can't think of anything real specific.
>
> Q: Did Mr. Cyrluk say anything at all to you about the allegations in the lawsuit?
>
> A: No. (Salela Dep., at 26-30).

Plaintiff's counsel then asked whether Mr. Cyrluk asked about any of the parties in the lawsuit – he asked one by one – and Ms. Salela again answered, "no." (Salela Dep., at 31). He asked why she thought Mr. Cyrluk had been there, and she said she thought it was simply to "meet" her. (Salela Dep. at 31). He again asked how long Ms. Salela met with Mr. Cyrluk, and she answered as she did before: "It was a very short period of time, 20 minutes, had a sandwich, hi, how are you." (Salela Dep., at 31).

The plaintiff wisely does not argue that any of this was privileged, even though for Ms. Salela's testimony to have amounted to a waiver, she would have had to have disclosed *privileged* information. "[W]aiver cannot stem from an unprivileged communication." *Allen-Bradley Co., Inc. v. Autotech Corp.*, 1989 WL 134500, 1 (N.D. Ill.1989). *See United States v. Seale*, 600 F.3d 473, 493 (5th Cir.2010)("'As a general rule, implied waiver of [the attorney-client privilege] occurs *when the party claiming the privilege has made any disclosure of a confidential communication* to any individual who is not embraced by the privilege.'") (brackets and emphasis in original); *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1126 (7th Cir. 1997); *United States v. Place*, 913 F.2d 1375 (9th Cir.1990); *Lorenz v. Valley Forge Ins. Co.*, 815 F2d 1095, 1099 (7th Cir. 1987).

Since Ms. Salela disclosed nothing confidential, and since content not chronology is what counts, it is quite beside the point that "the [disclosed] conversations were during the course of Ms. Salela's deposition preparation ...." (*Plaintiff's Reply*, at 6). And unless the English language has lost all meaning, it is idle to contend that Ms. Salela's disclosures waived the privilege because that which was disclosed and that which was not, related "to the same subject matter – her deposition preparation." (*Plaintiff's Reply*, at 7).[7] *Cf., Chicago Bd. Options Exchange, Inc. v. International Securities Exchange, LLC*, 2008 WL 3285751, *3 (N.D.Ill. 2008).

## CONCLUSION

The Motion to Compel quotes me in a telephone conference with counsel for the parties at the time of the Salela deposition as saying that the defendants' position was "totally wrong." But

---

[7] If plaintiff is right, a privilege log would result in a waiver of the very privilege the log was intended to protect, since what was disclosed and what was withheld related to the "same subject matter" – the described document.

that comment was made without the benefit of briefing or even full explanation of the parties' respective positions – which given the setting was, of course, impossible. In any event, further reflection based upon plenary briefing has shown two things: First, "all judges make mistakes." *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997)(Posner, J.),[8] and second, adversarial briefing is indispensable to informed decision-making, for "the judicial process [is] at its best" only when there are "comprehensive briefs and powerful arguments on both sides...." *Adamson v. California*, 332 U.S. 45, 59 (1946) (Frankfurter, J., concurring). *See also United States v. Cronic*, 466 U.S. 648, 655 (1984)("'[t]ruth' is best discovered by powerful statements on both sides of the question.'").[9] Having now had the benefit of the parties' thoughtful briefs and time for adequate study, the Plaintiff's Motion to Compel [101] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 9/14/10

---

[8] *See also Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992); *Illinois v. Allen*, 397 U.S. 337, 346-347 (1970); *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (*en banc*)("Being manned by humans, the courts are not perfect and are bound to make some errors.").

[9] *Accord Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613-614 (7th Cir.2006); *Burdett v. Miller*, 957 F.2d 1375, 1380 (7th Cir.1992); *Albrechtsen v. Regents of University of Wisconsin System*, 309 F.3d 433, 436 (7th Cir.2002)

17