**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE PAMPERED CHEF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 10 C 1399 |
| | ) | |
| SANDY ALEXANIAN, DON FUNT, | ) | |
| CHRISTINE LAURICH, LORI MITCHELL, | ) | **Magistrate Judge Cole** |
| VALERIE NEWTON, SHANNON PELL, | ) | |
| ELAINE SCHUTTER and SYBIL GOADE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

The Pampered Chef is a direct sales company that sells kitchenware through home parties hosted by family and friends of the members of its sales force, who are independent contractors. Jewels by Park Lane is another direct sales company that sells jewelry. Pampered Chef has taken umbrage at the loss to Park Lane of several of what it calls its most valuable, upper-level "Directors," who are highly-placed individuals in the pyramidal sales structure used by Pampered Chef and others in the direct sales industry. The defecting Directors were free to leave Pampered Chef whenever they chose. However, under their contracts, they were not free to solicit or recruit any Pampered Chef Director or any of its 58,000 sales consultants to join them at another direct sales company. Also, the Directors could not permit anyone to use the names of any of Pampered Chef's nationwide salesforce for recruiting or promoting the sales of another company's products or services.

The Second Amended Complaint ("Complaint"), insofar as is pertinent at this juncture, alleges that defendants, Sandy Alexanian, Don Funt, Christine Laurich, Valerie Newton, Elaine Schutter and Sybil Goade, breached their Pampered Chef Director agreements by "directly and unabashedly soliciting and recruiting members of Pampered Chef's sales force to join the sales force of Park Lane." (Complaint, ¶183). The Complaint charges Lori Mitchell and Shannon Pell, who are affiliated with Park Lane, with tortious interference with the Pampered Chef's contracts with the Directors and/or with tortious interference with Pampered Chef's business expectancy with its consultants and Directors by inducing the defendant Directors to provide names of Pampered Chef consultants and Directors whom Mitchell and Pell could and did solicit to join Park Lane. (Complaint, ¶¶202-207, *et. seq.*). Pampered Chef seeks a preliminary injunction against Ms. Mitchell and Ms. Pell.[1]

Resolution of a motion for preliminary injunction and resolution of a case on the merits involve "significantly different" inquiries. *University of Texas v. Camenisch*, 451 U.S. 390, 393 (1981). Since "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," *id.* at 395, a plaintiff need not prove its case in full, and the court's findings of fact and conclusions of law are not binding at a trial on the merits. *Id. See also IDS Life Insurance. Co. v. SunAmerica, Inc*, 103 F.3d 524, 530 (7th Cir. 1996).

This case, however, has taken a path different from the abbreviated course envisioned by the cases. In addition to two days of testimony, the parties' submissions were voluminous.

---

[1] The motion for preliminary injunction is so limited, because there appeared to be a settlement with the other defendants. Since then, the settlement has been called into question. The defendants have moved to enforce what they believe is a settlement, while Pampered Chef denies that a settlement was reached.

Collectively, they consisted of 12 three-inch spiral binders of numbered exhibits, totaling perhaps 10,000 pages. Additionally, there are 5 volumes of deposition transcripts, totaling approximately 500 pages, plus an additional 800 pages of exhibits to the depositions. This was in advance of the parties' briefs, to which were attached a number of exhibits. To encourage some factual organization, the parties were instructed even before the briefing was completed to comply with Local Rule 56.1 solely as it pertained to the presentation of facts. [Dkt. # 168]. Of course, this is not a summary judgment case, and the parties were aware of the very limited purpose for which the organizational structure provided by a Rule 56 statement of facts was resorted to.[2] The motion for preliminary injunction is here for determination by limited consent pursuant to 28 U.S.C. §636(b)(1)(c).

## I.

## FACTUAL BACKGROUND [3]

Pampered Chef is a direct sales company that sells its kitchen wares through home parties hosted by family and friends of the members of its sales force. (*Plaintiff's Amended Local Rule 56.1 Statement* ("*Pl.St.*"), ¶ 1; Ex. 1, Tr. 87:13-16; 369:2-370:15; 535:25-536:3). That force is made up entirely of independent contractors – none are employees. (*Pl.St.*, ¶ 2; Ex. 1, Tr. 246:20-247:16; 447:5-7). That is common in the direct sales industry. Direct sales is a method of distributing products, employed by many similar companies. (*Pl.St.*, ¶ 3; Ex. 1, Tr. 369:16-370:15; 443:8-444:6; 448:5-25). Pampered Chef's sales force is nearly 60,000 strong, broken down into a hierarchy of

---

[2] The parties did not object to use of this organizational model.

[3] The factual findings in this section of the opinion and those in the Analysis section will serve as the required findings of fact pursuant to Rule 52(a)(2), Federal Rules of Civil Procedure.

about 55,000 "consultants," 2,500 "senior consultants," and 1,000 team leaders at the top. (*Defendants' Local 56.1 Statement of Facts* ("*Def.St.*"), ¶ 1; Ex. A, Tr. 623). The consultants come and go – in droves and with unremitting consistency. The turnover rate is about 60% annually, and they are replaced as quickly as they are lost. (*Def.St.*, ¶ 3; Ex. A, Tr. 633).

For example, in 2008, Pampered Chef lost approximately 30,000 consultants, but gained an equal number in the same time period. In 2009, Pampered Chef lost 37,000 consultants, but added an equal amount of new consultants. From January 1, 2010 through October 1, 2010, Pampered Chef lost 20,000 consultants, but gained 24,000 new ones. (*Def.St.*, ¶ 3; Ex. A, Tr. at 632:22-633:22). This rapid and consistent turnover is consistent with the historically high rate of turnover in the direct sales industry. *See infra* at 34.

To move up in the hierarchy and become a Director, a consultant must recruit a certain number of other people to become consultants. (*Def.St.*, ¶ 4; Ex. B, Jonas Dep. at 60:18-68:19). Directors are compensated on the basis of their sales, the sales of their recruits, and the sales of their recruits' recruits. (*Def.St.*, ¶ 4; Ex. E, Capinegro Dep. at 143:8-144:1; Ex. L (Pampered Chef Policy Guide), at 15-33). Above the Director level, there is Advanced Director, Senior Director, Executive Director, Senior Executive Director, and National Executive Director. (*Def.St.*, ¶ 4; Ex. B, Jonas Dep. at 60:18-68:19; Ex. K; Ex. L at 15-33). To ascend the ladder from Director to Advanced Director and above, a Director must recruit more people and have their recruits recruit more people and so on. (*Def.St.*, ¶ 4; Ex. A, Tr. at 86:19-90:3; Ex. B, Jonas Dep. at 60:18-68:19; Ex. L at 15-33). As of August 2010, there were 18 National Executive Directors, who earned an average of $282,031 per year. At the same time there were 1,347 base level Directors, who earned approximately $14,205 per year on average. (*Def.St.*, ¶ 7; Ex. C at TPC 000923, 000926).

Pampered Chef changed the rules in 2009. Those who had already qualified as base-level Directors in 2008, no longer qualified in 2009. The consequence, of course, was less income for those affected. (*Def.St.*, ¶ 8; Ex. A, Tr. at 171:11-172:1; 322:22-323:23). In the aftermath, there were approximately 1,000 fewer Directors in 2010 than there were on December 31, 2009, when there were approximately 3,021 Directors. The change also made it more difficult to qualify for certain consultant levels, and many people were demoted. (*Def.St.*, ¶ 8; Ex. C at TPC 000926; Ex. A, Tr. at 636:22-638:3; Ex. B, Jonas Dep. at 199:1-6).

It was during this period – from about March 2008, when Valerie Newton, the first Director left Pampered Chef, through about April 2010 – that 13 Directors and 4 Consultants left Pampered Chef and moved to Park Lane. (*Def.St.*, ¶ 33; Ex. A, at 595:17-25). Defendants, Alexanian, Funt, Laurich, Newton, Goade, and Schutter ("Director defendants"), were among them. (*Pl.St.*, ¶ 4; Ex. 1, Tr. 234:24-25; 361:15-19, 22-24; 235:18-22; 86:2-5; Ex. 2, Alexanian Dep. at 5:5-8, 19:23-20:7, 158:11-21; Ex. 3, Funt Dep. at 5:8-10, 22:4-20, 30:21-23; Ex. 4, Goade Dep. at 9:1-4; 65:7-8; 10:25-11:3).

At the time they became Pampered Chef Directors, they signed Independent Sales Director Agreements, which included confidentiality and non-solicitation provisions:

F. Confidentiality

1. Director acknowledges that Company has provided Director and Director has received from the Company special training and knowledge and the Company has given Director access to trade secrets and other valuable information which is confidential and proprietary in nature. Director understands and confirms that all such trade secrets and other valuable information constitute the exclusive property of the Company. During the term of this Agreement and for two years after termination of this Agreement, Director shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person or use for the personal benefit of Director or anyone else any trade secrets and other confidential or proprietary information of any kind that has been obtained by or disclosed to Director as a result of Director's position in the Company's independent contractor field sales force.

\* \* \*

I. Non-solicitation

1. Director agrees that Director has received valuable consideration from the Company in the form of specialized training and sales management training in connection with the Director's business opportunity with the Company. Director also acknowledges the receipt of valuable publicity, goodwill and promotional support from the Company to enhance Director's business success. In consideration of the awards, rights and privileges contained in this Agreement, Director agrees that, beginning as of the date of this Agreement and continuing for two years after the effective termination date of this Agreement, Director (a) will not engage, directly or indirectly in soliciting, inducing or recruiting any person whom Director knows or has reason to believe is then under contract as a member of Company's independent contractor sales field to sell products or services other than those sold by Company or to terminate their business relationship with the Company whether such solicitation or inducement is for Director's own benefit or that of others; and (b) will not use, or knowingly permit any other person to use any names, mailing lists or other information which Director has obtained during Director's association with the Company for recruiting, or for promotion of the sales of any other company's product or services.

(*Pl.St.*, ¶ 5; PX 76, PX 92, PX 93, PX 95, PX 96, PX 58, Goade Dep. Exs. 4 and 5; Ex. 1, Tr. 90:13-21; 242:5-18; 245:11-13; 364:9-11; Ex. 2, Alexanian Dep. 67:19-68:9).  The motion for preliminary injunction is not based on any claim of breach of the confidentiality provision, but solely on the nonsolicitation clause.

In its statement of facts,  Pampered Chef claims that agreements such as those signed by its Directors are "standard in the direct sales industry and are critical to Pampered Chef because its sales force is completely voluntary and can leave at any time." (*Pl.St.*, ¶ 7).  As support for the assertion, Pampered Chef relies on the testimony of John Fleming, (*Pl.St.* , ¶ 7; Ex. 1, Tr. 447:25-448:4; 245:20-246:19; 580:23- 581:11), whom it called as an expert .  Mr. Fleming never testified that all direct sales companies had non-solicitation clauses in their contracts.  All he said was that "virtually all of the direct selling companies with which [he was] familiar utilize *some form* of

independent contractor agreement for their independent sales force. . . ." (*Pl.St.* , ¶ 7; Ex. 1, Tr. 447:25-448:4 (emphasis supplied)). Moreover, the non-solicitation clause – the focus of this litigation – is not even a standard feature of Pampered Chef's contracts: None of the almost 60,000 consultants who comprise the independent sales force are bound by such a restriction, and thus are free upon leaving Pampered Chef to solicit any other consultants or Directors. (*Defendants' Response to Local Rule 56.1 Statement* ("*Def.Rsp.*"), ¶ 7)(Ex. A, Tr. at 575:23-576:6; 599:9-19; 623:4-22; Ex. B, Deposition of Jean Jonas ("Jonas Dep.") at 254:2-8.).

Mr. Fleming was called to explain the effects on Pampered Chef and other similarly structured companies in the direct sales industry that occur when a Director is lured away by another company. He claimed that when a "high level consultant" leaves the company, the company becomes "vulnerable because of broken trust, broken relationships, and fractured belief causing injury to the corporation which cannot be quantified." (*Pl.St.*, ¶ 8; Ex. 1, Tr. 448:15-25; 452:5-454:2; 455:20-456:4; *Pl.St.*, ¶ 9; Ex. 1,Tr. 456:7-20; 477:25-478:8; 480:13-481:10). Here is a sampling of what he said:

> Q: What happens when people at the higher level are pulled out in a short period of time to go to a competitor of another direct selling organization?
>
> A: Well, if this is the target, and this person –
>
> Q: By "this" you're referring to whom, the consultant with the organization?
>
> A: The consultant who leads the organization. If this person is the target, then obviously the whole organization becomes vulnerable to whatever decisions might be up there. So now you get broken trust. You get broken relationships. You get fractured belief. And you have all these things going on within the organization possibly as well as outside the organization, because the other organization is just like this one that are a part of ABC.

(*Pl.St.*, ¶ 9; Ex. 1,Tr. 456:7-20). Mr. Fleming's testimony is discussed in greater detail *infra* at 41,

*et seq.*

Defendant, Christine Laurich, one of the exiting Directors, testified that Pampered Chef provided the Directors with the following:

a. Creation and maintenance of online cluster reports to allow members of its sales force to see information about their downline, including sales and recruiting information (Ex. 1;Tr. 236:22-237:6);[4]

b. Creation and maintenance of The Pampered Chef's website for use by its consultants and Directors (Tr. 237:10-13; 238:25-239:10) (Ex. 1);[5]

c. Creation, maintenance and design of personal websites for use in consultants' personal businesses (Tr. 237:14- 238:1) (Ex. 1);

d. Support staff available to help consultants with any problems they had with their respective businesses (Tr. 238:2-13) (Ex. 1) and customer service numbers for Pampered Chef customers to call with issues (*id.* at 14-16) at no cost to the sales force members;

e. Warranties for defective products at no charge to consultants (Tr. 239:13-18) (Ex.1);

f. Design and creation of catalogs and brochures for consultants to use to sell products (Tr. 239:24-240:4) (Ex. 1);

g. Free credit card processing for ease of purchase at no cost to consultants (Tr. 240:5-13) (Ex. 1);

h. Monthly promotions for hostesses and guests at no cost to consultants (*id.* at 14-20) (Ex. 1):

i. Creation, development, and testing of recipes for consultants to use at shows (Tr. 240:23-241:7) (Ex. 1);

---

[4] Pampered Chef does not define "downline"; it would appear to be those sales people working directly under a Director who, in turn, would have their own "downlines." (Ex. 1, Tr. at 579-80).

[5] Pampered Chef does not define "consultants" or "Directors." At times, it seems the terms are used interchangeably, but "consultants" are below "Directors" in Pampered Chef's pyramidal structure.

j. Creation of a seasonal DVD provided to each consultant to show how each new product is used and each new recipe is made (Tr. 241:8-18) (Ex. 1);

k. Development of free online classes available to consultants (*id.* at 19-23) (Ex. 1); and

l. Overrides on commissions of their downline consultants. (Tr. 244:24-245:1) (Ex. 1).[6]

(*Pl.St.*, ¶ 6).  Consultants were provided with items (b)-(k).  (*Def.St.*, ¶ 6; Ex. A, Tr. at 236:18-245:1).  Ms. Laurich had to pay for the use of item (c), the personal website.  (*Def.St.*, ¶ 6; Ex. A, Tr. 237:14-19).  She understood that she could leave The Pampered Chef's sales force at any time, and that nothing in her contracts prohibited her from selling jewelry for Park Lane or from selling for any other direct sales company. (*Pl.St.*, ¶ 13; Ex.1; Tr. 245:20-246:19).

Defendant Shannon Pell has been a Park Lane National Director since 2007.  Part of her job is helping  top executives from other direct sales programs transition to Park Lane.  (*Pl.St.*, ¶ 14; Ex. 1, Tr. 495:11-14; 497:15-498:5).   She interviews prospective sales people and trains new recruits.  (*Pl.St.*, ¶ 17; Ex. 6, Pell Dep. at 16:17-17:17; 18:20-19:5).  Ms. Pell would not characterize what she does as recruiting.  She said she informs the interviewees about the benefits of Park Lane and how they can participate.  (*Pl.St.*, ¶ 24).  She earns $200,000 a year.  (*Def.Rsp.*, ¶ 17; Ex. A, Tr. at 497:7-10, 524:22-526:5).

Previously, Ms. Pell held the same type of position at another direct sales company, PartyLite, where she worked for 21 years.  (*Pl.St.*, ¶ 18; Ex. 1, Tr. 534:8-18; 535:7-13).  As a result, she is familiar with the agreements sales people sign at both PartyLite and Park Lane, and assumes

---

[6] "Override" is not defined, but it appears to be the commission a Director receives on the sales of the consultants below her.

that consultants at other such companies sign "some kind" or "some form" of agreement as well. (*Pl.St.*, ¶¶ 19-20; Ex.6, Pell Dep. at 60:10-61:21). And, she is aware that Pampered Chef is another direct sales company. (*Pl.St.*, ¶ 21; Ex. 1, Tr., at 535:25-536:3). But as for specific clauses, Ms. Pell said she did know what the PartyLite contract contained. (*Def.Rsp.*, ¶ 18; Ex. A, Tr. at 548:14-550:4). She claimed to be unfamiliar with the term "non-solicitation provision" until this lawsuit. (*Def.Rsp.*, ¶ 18; Ex. A, Tr. at 551:5-17; Ex.F, Deposition of Lori Mitchell ("Mitchell Dep.") at 301:1-20; 302:21-304:2; 304:13-25).[7]

Her claims not to know the contents of her agreements at PartyLite and not to have heard the term nonsolicitation until this suit are certainly open to serious question. The difficulty is that her version does not conform with the realities of how a sophisticated business woman like Ms. Pell functions in the business environment in which she has long participated. Inferences that may be drawn from the evidence in a particular case is governed by a rule of reason, "fact finders may properly 'use their common sense' and 'evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings.'" *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989). I do not credit Ms. Pell's denials.

Ms. Pell said she never heard the topic of whether any potential Park Lane recruit already had a contract with another company discussed at Park Lane. (*Pl.St.*, ¶ 22; Ex. 1, Tr., at 536:21-537:23). She has never discussed with anyone from Park Lane how to respond to a recruit's question regarding his or her contract with another direct sales organization, but she admitted that

---

[7] Defendants point out that in another case, an individual who was with PartyLite prior to 2006 "did not enter into non-solicitation or non-competition agreements in the event of her discharge or resignation." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 2006 WL 2370338, 2 (E.D.Tenn. 2006). But that does not necessarily mean Ms. Pell did not.

those questions have arisen. (*Pl.St.,* ¶ 23; Ex. 6, Pell Dep., at 110:2-7; 109:11-21). At her deposition, she testified:

> Q: So if I understand it correctly then, no one has ever, in your presence when you were presenting a business opportunity, said to you in words or substance, hey, is there any problem with my doing this because of my contract or words to that effect?
>
> A: If that were said to me, I would say I don't know. I don't know your contract. (Pl.St., ¶ 23)
>
> Q: Well, has anyone ever said that to you?
>
> A: I would say probably. Could I say who? No. I'm sure –

(Ex. 6, Pell Dep., at 109:11-21).

Ms. Pell never received any training or instruction from Park Lane about the recruitment of individuals affiliated with other direct sales organizations. (*Pl.St.*, ¶ 25; Ex. 6, Pell Dep., at 70:1-6). But, the Park Lane Executive Training Guide – the training guide for independent consultants at the executive and management level – teaches that one way to build a business for Park Lane is to recommend "direct appointments" of those with experience in direct selling. (*Pl.St.*, ¶ 26; Ex. 6, Pell Dep., at 144:14-145:8; 165:10-169:3; PX 106).[8] Such candidates are identified through recommendations within Park Lane. (*Pl.St.*, ¶ 26; Ex. 6, Pell Dep., at 175:3-12).

---

[8] Park Lane's direct recommendation program works this way: a sales person with prior experience at other direct sales companies can join Park Lane's sales force at a level commensurate with his or her experience instead of starting as an entry level sales associate. Thus, if a person was a Director at Pampered Chef, that Director could join Park Lane at a level equivalent to the Director level at Park Lane. Through its literature, Park Lane advises its independent contractors that they can refer people for direct appointment even if the referred person entered Park Lane at the same or higher level than the referrer. (*Def.St.*, ¶ 18; *see* Ex. 7 to Plaintiff's Local Rule 56.1 Statement, at Newton 000029). When a Park Lane consultant makes a referral, one of its independent contractors contacts the referral to determine if they are interested in an interview and if the referral would be good candidate for Park Lane. Park Lane determines at what level the person would come in at Park Lane. If the referral joins Park Lane, the person making the referral earns a 2% commission on all future sales of the new recruit and their future downline. (*Def.St.*, ¶ 18; Ex. A, Tr. at 416:12-21, 423:6-13, 425:21-426:14; Ex. 7 to Plaintiff's Local Rule 56.1 Statement at Newton 000029).

That is how most of the defendant Directors were brought into the Park Lane fold, with the exception of Ms. Newton. (*Pl.St.*, ¶ 27; *Def.Rsp.*, ¶ 27). In turn, each of those people provided Ms. Pell – or whomever was "interviewing" them – names of successful members of Pampered Chef's sales force who would likewise be eligible for direct appointment with Park Lane. (*Pl.St.*, ¶ 27; Ex. 8, Mitchell Dep. at 27:4-11; 59:25-60:3; 77:3-14; 81:6-10; 81:19-82:10; 83:11-25; 84:17-25; 85:1-18; 102:15-19; 104:1-10; 104:13-25; 110:3-111:11; 127:21-129:14; 130:1-13, 132:5-15; 150:20-151:15; 154:9-20; 170:24-171:1; 171:22-172:25; 173:11-15; 174:14-18; Ex. 9, PX 100 Mitchell 000010, 74, 78, 53-55, 59, 115-121; Ex.1, Tr. 374:5-8; 374:22-375:23; 376:1-379:6; 416:1-22; 418:11-14; Ex. 10, PX 101 Newton 000010-18; Ex. 11, Newton Dep. 220:23-221:13).

Ms. Pell met with Pampered Chef Directors Funt and Laurich while they were with Pampered Chef and offered them positions with Park Lane. (*Pl.St.*, ¶ 31; Ex. 1, Tr. 247:20-23; 502:22-24; 506:19-507:6). Ms. Pell never asked Mr. Funt whether he had any form of an agreement similar to her agreement with PartyLite. (*Pl.St.*, ¶ 32; Ex. 1,Tr. 536:14-20).[9] Ms. Pell asked him to describe what a good month for him would be at Pampered Chef and told him how much that would allow him to make with Park Lane. (*Pl.St.*, ¶ 32; Ex. 1, Tr. at 539:18- 540:6). She did not tell Mr. Funt that the reason for bringing him in at Park Lane was so he would recruit people from Pampered Chef. In fact, she said it was "made clear that" the position he was offered at Park Lane was based on his experience and "[w]hether he decide[d] to recruit or sell a thing he would still be a sales vice president." (*Def.Rsp.*, ¶32; Ex. A, Tr. at 506:19-507:6).

_____

[9] Pampered Chef claims that, during this meeting, Ms. Pell explained that, if Mr. Funt could recommend other people who had direct sales experience, including party plan experience, he would be paid a percentage. This statement cites to "*Id.* at 4-24," which refers back to the prior citation to "Ex. 1, Tr. 536." (*Pl.St.*, ¶ 32). The cited portion of the testimony does not support the claim.

Ms. Pell was present when Mr. Funt and Ms. Laurich resigned from Pampered Chef and told their "downlines" that they were joining Park Lane. (*Pl.St.*, ¶ 29; Ex. 1, Tr. 248:23-250:20; 531:8-532:13). Then, Ms. Pell pitched the downline on the business opportunity at Park Lane. (*Pl.St.*, ¶ 30; Ex. 1, Tr. 248:23-250:20).

Christine Laurich also gave Ms. Pell the names of several members of Pampered Chef's sales force to join Park Lane including Kim McGee, Angela Harris, Krysia Moore, Sybil Goade, Laura Harrison, Theresa Jennings, Shannon Cerra, Joan Bischoff, Doina Heinz, and Jana Arkell. (*Pl.St.*, ¶ 59; Ex. 1, Tr. 252:19-254:3; 256:11-257:1; 258:15-260:8; 261:16-264:20; 266:14-20; 271:3-276:1; Ex. 9, PX 100; Ex. 13, PX 89). These were people Ms. Laurich knew solely through her affiliation with Pampered Chef. She told them about Park Lane, but neither invited nor encouraged them to join Park Lane. (*Def.St.*, ¶ 59; Ex. A, Tr. 253:5-14). She provided their names to Ms. Pell because they had high levels of sales and strong recruiting numbers. (*Pl.St.*, ¶ 59; Ex. 1,Tr. 264:24-265:9; 270:4-25). Park Lane's policy, set forth in their brochure, was that any recommendations be of those at her level or higher. (*Def.Rsp.*, ¶ Ex. A, Tr. at 259:22-261:15). Ms. Pell forwarded Ms. Laurich's list to her colleague at Park Lane, Lori Mitchell. (*Pl.St.*, ¶ 60; Ex. 8, Mitchell Dep. at 150:20-151:15; 154:9-20; Ex. 9, PX 100 Mitchell 000078).

Defendant Lori Mitchell had been the National Director of Executive Management for Park Lane since 1999. (*Pl.St.*, ¶ 33; Ex. 8, Mitchell Dep. at 6:21-7:2). Prior to that, she was affiliated with the pioneer of direct selling, Tupperware, from 1965 to 1993. (*Pl.St.*, ¶ 34; Ex. 8, Mitchell Dep. at 183:13-184:15). Ms. Mitchell had a contract when she signed on with Tupperware, and signed another agreement when she was promoted within the ranks of Tupperware. (*Pl.St.*, ¶ 34; Ex. 8, Mitchell Dep. at 186:11-21). Similarly, she also signed a contract when she moved to Park Lane

to become a Director. (*Pl.St.*, ¶ 35; Ex. 8, Mitchell Dep. at 190:1-7; Ex. 12, PX 7). She did not know the specific provisions of her contracts with Tupperware or whether those agreements contained similar restrictions to the restrictions at issue in this case. (*Def.Rsp.*, ¶ 35; Ex. F, Mitchell Dep. at 184:1-8; 184:10-15; 187:8-189:22; 302:21-304:2). Like Ms. Pell, Ms. Mitchell said she was unfamiliar with the term "non-solicitation clause" until this litigation. (*Def.Rsp.*, ¶ 35; Ex. F, Mitchell Dep. at 190:4-20, 192:4-11, 304:13-23; Ex. A, Tr. at 550:14-551:12).

This aspect of her testimony is not credible. In fact, Park Lane's agreements have a one-year non-solicitation clause that states Directors shall not "call upon, solicit, divert or take away any of the company's employees or Independent Contractors." (*Def.Rsp.*, ¶ 35; Ex. 12; *Pl.St.*, ¶ 36; Ex. 8, Mitchell Dep. at 340:13-341:12; 342:4-9; Ex. 12, PX 7). Ms. Mitchell said she was not aware of any direct selling organization that does not have a requirement for a signed agreement similar to the Park Lane agreement but, then again, her experience is limited to two companies – she didn't "know any other contract or if there were any." (*Pl.St.*, ¶ 37; Ex. 8, Mitchell Dep. at 218:20-219:2; *Def.St.*, ¶ 37; Ex. F, Mitchell Dep. at 219:9-19).

In 2009, Ms. Mitchell earned close to $280,000, which was based almost exclusively on the number of recruits she brought to Park Lane. (*Pl.St.*, ¶ 38; Ex. 8, Mitchell Dep. at 7:3-15; 9:3-17; 10:8-11:10; 11:7-10; 71:11-16). For example, she received a commission when Defendants Chris Laurich and Don Funt joined Park Lane. (*Pl.St.*, ¶ 47; Ex. 8, Mitchell Dep. at 143:1-5; 147:23-25). Only $2,000 of her earnings was based on sales she personally made. (*Pl.St.*, ¶ 39; Ex. 8, Mitchell Dep. at 7:18-8:13). Ms. Mitchell gets names of potential recruits from individuals within Park Lane – sometimes from Joyce Salela – calls them to set up an interview to talk to them about the Park Lane business opportunity, and she asks them about their sales accomplishments. (*Pl.St.*, ¶ 40, 48;

Ex. 8, Mitchell Dep. at 27:16-28:22; 37:25-40:10; 79:6-19; 91:10-19; 27:4-11; 77:3-14; 95:8-16; Ex. 9, PX 100 Mitchell 000053, 57).

She never asked the prospects whether they were subject to any form of written agreement with their present companies because she didn't think it was relevant. (*Pl.St.*, ¶ 44; Ex. 8, Mitchell Dep. at 219:5-8; 220:9-13; 221:18-24). All she does is "present the Park Lane program, and that's it." (*Def.St.*, ¶ 44; Ex. F, Mitchell Dep. at 221:18-222:5). Ms. Mitchell doesn't handle the actual interviews – in the case of the names she got from Ms. Laurich, for example, she passed them along to Ms. Pell – but she sometimes sits in. (*Pl.St.*, ¶ 45; Ex. 8, Mitchell Dep. at 31:4-32:2; 40:11-12; 150:20-151:15). For example, she set up and attended Sandy Alexanian's interview, where she received an offer to join Park Lane. (*Pl.St.*, ¶ 45; Ex. 8, Mitchell Dep. at 40:11-12; 41:25-42:3; Ex. 2, Alexanian Dep. at 123:11-20). She got the lead on Ms. Alexanian from Mr. Funt, who actually gave her a list of prospects. (*Pl.St.*, ¶¶ 53-54; Ex. 8, Mitchell Dep. at 59:25-60:3; 81:6-10; 81:19-82:10;170:24-171:1; 171:22- 172:25; 173:11-15; 174:14-18; 180:6-18; Ex. 9, PX 100 Mitchell 000054, 115). Ms. Mitchell also attended Ms. Alexanian's introductory show for Park Lane. Generally, at introductory shows, like that, she talks about the business opportunity at Park Lane. (*Pl.St.*, ¶ 48; Ex. 8, Mitchell Dep. at 41:4-18; 44:8-10).[10] Ms. Alexanian told her downline she was resigning from Pampered Chef at that show; she told Ms. Mitchell shortly before that. (*Pl.St.*, ¶ 49; Ex. 8, Mitchell Dep. at 45:18-46:2).

Diana McDermott was another Pampered Chef prospect, whose name she got from Mr. Funt.

---

[10] Pampered Chef claims that's what she did at Ms. Alexanian's show, but the cited portion of the transcript does not support that claim; only that she attended Ms. Alexanian's show and that at shows like that she generally discussed the Park Lane business opportunity. (*Pl.St.*, ¶ 48).

(*Pl.St.*, ¶ 55; Ex. 8, Mitchell Dep. at 83:11-25; 84:17-25; 172:6-13; Ex. 9, PX 100 Mitchell 000055, 000118). When Ms. Mitchell called her, she told her that she had been recommended for a specific sales position with Park Lane that focused on leadership development, meaning recruiting more people to Park Lane. (*Pl.St.*, ¶ 56; Ex. 8, Mitchell Dep. at 85:1-18; Ex. 9, PX 100 Mitchell 000055).

Valerie Newton joined Park Lane in January 2008. (*Pl.St.*, ¶ 61; Ex. 1, Tr. 368:14-23). At the time, she was still a Pampered Chef Director, and remained one until March 2008. (*Pl.St.*, ¶ 61; Ex. 1, Tr. 368: 8-10). While still with Pampered Chef, Ms. Newton recruited or tried to recruit Pampered Chef's salespeople for Park Lane, including Marsha Hriz, Andrea Terry, April Dumond, Shawna Tipton, Duska Mills, Robin House, and Defendants Don Funt and Elaine Schutter (*Pl.St.*, ¶ 62; Ex. 1, Tr. 374:5-8; 374:22-375:23; 376:1-377:7; 414:24-415:24; Ex. 8, Mitchell Dep. at 102:15-19; 132:5-15; Ex. 11, Newton Dep. 220:23-221:13; Ex. 9, PX 100 Mitchell 000010; Ex. 10, PX 101). With the exception of Ms. Hriz, who was her neighbor and best friend, and Ms. Terry, she knew each of these people only through her affiliation with Pampered Chef. (*Def.Rsp.*, ¶ 62; Ex. A, Tr. at 399:24-400:4; *Def.St.*, ¶ 17; Ex. A, Tr. 400:5-21). Some of those recruited were among the most successful Directors in the organization, which is what motivated her to try and recruit them. (*Pl.St.*, ¶ 62; Ex. 1, Tr. 384:19-22; 414:24-415:24).

Ms. Hriz and Ms. Terry were Pampered Chef consultants, as opposed to Directors. (*Def.Rsp.*, ¶ 62; Ex. A, Tr. at 374:5-8, 400:15-24). Ms. Newton didn't know Ms. Terry from Pampered Chef. Ms. Dumond and Ms. Tipton joined Park Lane after expressing an interest in the company. (*Def.Rsp.*, ¶ 62; Ex. A, Tr. at 427:21-428:6). Beginning in July 2009, Ms. Newton sent emails to Ms. Mitchell providing her with the following names of several additional referrals, along with their success rates: Michele Ambrosius, Melanie Hague, Joyce Salela, Tanya Broslawsky, Jae

Hilgers, Sally Schubert, Leanne Chacksfield, Robin House, Gail Shendelman, Don Funt, Tish Jones, Sue Size, Jaime Early, Tammy Mayfield, Janice Verace, Pam Gibbs-Fitzgerald, Sara Pruisner. (*Pl.St.*, ¶ 64; Ex. 10, PX 101 Newton 000010-18). Ms. Newton did not tell any of the people she referred to Ms. Mitchell that she had passed their names along to Park Lane. (*Pl.St.*, ¶ 65; Ex. 1, Tr. 388:3-389:7).

She hoped that these referrals would be placed on her team, thus entitling her to a commission for their recruitment and future sales. (*Pl.St.*, ¶ 66; Ex. 1, Tr. 376:25-378:19). That is exactly what happened. (*Pl.St.*, ¶ 67; Ex. 1, Tr. 378:17-379:6; 416:1-22). She specifically gave the names to Ms. Mitchell because she knew that Ms. Mitchell was the person to send lists of potential recruits to for the recommendation program. (*Pl.St.*, ¶ 68; Ex. 1, Tr. 418:11-14). But Ms. Mitchell did not direct her to do so. (*Defendant. Rsp.*, ¶ 64; Ex. A, Tr. at 402:14-403:5).

Ms. Mitchell met with Gail Shendelman – one of the leads from Ms. Newton – regarding a position with Park Lane. She knew Ms. Shendelman was a Pampered Chef Director. (*Pl.St.*, ¶ 69; Ex. 8, Mitchell Dep. at 99:11-24; 100:11-101:4; 104:1-25; 106:1-22; Ex. 9, PX 100 Mitchell 000058).

When Mr. Funt resigned from Pampered Chef on December 11, 2009, (*Pl.St.*, ¶ 70; Ex. 3, Funt Dep. at 22:7-9), he had already entered into an agreement with Park Lane, having been recommended by Ms. Newton. (*Pl.St.*, ¶ 70; Ex. 3, Funt Dep. at 30:21-23; Ex. 10, PX 101 Newton 000013). Even before leaving Pampered Chef, Mr. Funt began providing names of Pampered Chef salespeople to Ms. Mitchell. (*Pl.St.*, ¶ 71; Ex. 9, PX 100 Mitchell 000054). Mr. Funt gave Ms. Mitchell a seven-page document, entitled "More from Don Funt," containing over fifty names and telephone numbers of members of Pampered Chef's sales force. (*Pl.St.*, ¶ 72; Ex. 9, PX 100 Mitchell

00054, 115-121).

Ms. Mitchell also contacted Elaine Schutter for a position with Park Lane. (*Pl.St.*, ¶ 73; Ex. 8, Mitchell Dep. at 107:10-108:9; Ex. 9, PX 100 Mitchell 000059). Later, Ms. Schutter provided Pampered Chef leads to Ms. Mitchell and told her that she did not want those persons knowing she was the source of the referrals unless they joined Park Lane. (*Pl.St.*, ¶ 74; Ex. 8, Mitchell Dep. at 110:3-111:11; Ex. 9, PX 100 Mitchell 000059). If those leads joined Park Lane, under certain circumstances, both Ms. Schutter and Ms. Mitchell would be paid commissions. (*Pl.St.*, ¶ 76; Ex. 8, Mitchell Dep. at 111:7-23; *Def.Rsp.* ¶ 76; Ex. A, Tr. 522:14-524:14). One of those leads, Katie Ketchum, later joined Park Lane. (*Pl.St.*, ¶ 75; Ex. 8, Mitchell Dep. at 127:21-129:14; 130:1-13; Ex. 9, PX 100 Mitchell 000074). Joyce Salela also provided Ms. Mitchell with leads for her recruiting efforts, including Pampered Chef Director Karen Daniels, and Mitchell contacted them. (*Pl.St.*, ¶ 52; Ex. 8; Mitchell Dep. at 27:4-11; 77:3-14; 95:8-16; Ex. 9; PX 100 Mitchell 000053, 57).

It is common knowledge that, within Park Lane, Ms. Mitchell is the person to whom referrals should be sent. (*Pl.St.*, ¶ 51; Ex. 8; Mitchell Dep. at 294:16-19). Ms. Mitchell has been receiving lists of people to call since 1999, but said she does not ask anyone to send them to her. They know to do so by word of mouth or the fact that she is listed as national Director of Executive Management on the company's website. (*Def.St.*, ¶ 51; Ex. F, Mitchell Dep. at 293:15-294:19).

# II.
# ANALYSIS[11]

---

(continued...)

## A.
## The Standards For Issuance Of A Preliminary Injunction

"We begin with the basics. A preliminary injunction is an 'extraordinary and drastic remedy,' ...; it is never awarded as of right...." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). It "'should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(emphasis in original)(citation omitted). *Accord Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of America, Inc*., 549 F.3d 1079, 1085-86 (7th Cir. 2008)(entering a "'preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'").

In order for a preliminary injunction to issue, the plaintiff must show that it is *likely* to succeed on the merits, that it is *likely* to suffer irreparable harm without the injunction, that the harm it would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and that the injunction is in the public interest. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's repeated] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 129 S.Ct. 365, 375-376 (2008). These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010). "[T]he equitable personality of injunctive relief requires the result to be a 'just' or 'fair' result rather than

---

(...continued)
[11] This section will serve as the conclusions of law required by Rule 52(a)(2), Federal Rules of Civil Procedure.

a 'correct' result." *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1435 (7th Cir.1986).

## B.

### The Likelihood of Success on the Merits

The degree of likely success on the merits that must be shown has been variously defined as "a better than negligible chance," *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096, and a "'reasonable probability of success.'" *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 340 (1999). *See also Digrugilliers v. Consolidated City of Indianapolis,* 506 F.3d 612, 618 (7th Cir. 2007)(claim must have "at least some merit."). No matter what formulation is used in a given case, the showing required is a "low" one. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096.

As noted, Pampered Chef's Complaint advances two claims against Ms. Pell and Ms. Mitchell. The first is for tortious interference with the contracts Pampered Chef had with the Director defendants. (Complaint, Count IV, ¶200, *et seq.*). Count IV charges that Ms. Pell and Ms. Mitchell, in their efforts to recruit for Park Lane, used proprietary information in the form of the identities of Pampered Chef's sales force that was provided to them by the defendant Directors. Pampered Chef's briefs have abandoned this aspect of the Complaint, however, and do not rely on the supposed proprietary nature of the names and contact information of members of the sales force provided to Pell and Mitchell.[12] Rather, the theory is that Ms. Pell and Ms. Mitchell knew about the

---

[12] At the preliminary injunction hearing, there was an extended debate about and a good deal of evidence relating to the seemingly easy access many had to this information, which was available through a Google search, even without any password. As a consequence of what came to light at the hearing, Pampered Chef changed its computer protocols. Hence the abandonment in the briefs of the arguments that the identities of the Directors and consultants and their sales figures constituted proprietary information.

former Directors' nonsolicitation clauses in their contracts and nonetheless induced them to provide the names of successful Directors and members of Pampered Chef's sales force.

Under Illinois law, to succeed on this claim, Pampered Chef must demonstrate: (1) a valid and enforceable contract; (2) defendant's awareness of the contractual obligation; (3) defendant's intentional and unjustified inducement of the breach; (4) a subsequent breach caused by defendant's unlawful conduct; and (5) resultant damages. *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004).

The second claim is for tortious interference with prospective economic advantage. (Complaint, Count V, ¶207, *et seq.*). This claim is discussed in detail *infra* at 67.

## 1.

### The Validity And Enforceability Of The Non-Solicitation Clause

#### a.

Post-employment restrictive covenants operate as partial restraints on trade and, as a result, are disfavored and carefully scrutinized under Illinois law. *Advent Elecs., Inc. v. Buckman,* 112 F.3d 267, 274 (7th Cir. 1997); *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.,* 378 Ill.App.3d 437, 447, 879 N.E.2d 512 (1st Dist. 2007). The enforceability of any restrictive covenant is a question of law. *Liautaud v. Liautaud*, 221 F.3d 981, 986 (7th Cir. 2000). To be enforceable, it must be both reasonable and necessary to protect a legitimate business interest of the protected party. *Id.* at 987; *Reliable Fire Equipment Co. v. Arredondo*, 405 Ill.App.3d 708, 764, 940 N.E.2d 153, 197 (2nd Dist. 2010)(analyzing in detail the history of the legitimate business interest test in Illinois); *Cambridge Engineering, Inc.,* 378 Ill.App.3d at 447, 879 N.E.2d at 522. If it is not, the clause is invalid and unenforceable. *Reliable Fire Equipment Co.*, *supra*; *Lifetec, Inc. v. Edwards*,

377 Ill.App.3d 260, 273, 880 N.E.2d 188, 199 (4th Dist. 2007). It is beside the point that "the parties agreed to such an arrangement." *Advent*, 112 F.3d at 274.

Courts will not enforce restrictive covenants that: (1) impose restrictions greater than those necessary to protect the legitimate interests of the protected party, (2) are oppressive to the restricted party, or (3) are harmful to the general public. *Liautaud*, 221 F.3d at 987 (collecting Illinois cases). *Cf., Mohanty v. St. John Heart Clinic, S.C.,* 225 Ill.2d 52, 76, 866 N.E.2d 85, 98-99 (2006)("In determining whether a restraint is reasonable, it is necessary to consider whether...the restraint imposed is greater than is necessary to protect the promisee.'"); *Kempner Mobile Elecs., Inc. v. Southwestern Bell Mobile Sys., LLC*, 2003 WL 1057929, 19 (N.D.Ill. 2003)("In assessing the reasonableness of the restrictions [Illinois courts] consider the interests that [the protected party] seeks to protect by the restrictions; the duration and geographical scope of the restrictions; and the activities that are sought to be restrained.").

The threshold question is whether what Pampered Chef calls "maintaining a stable workforce" qualifies as a protectible, legitimate, business interest under Illinois law, and whether the means chosen are necessary and reasonable. Since questions of necessity and reasonableness always involve "a context-specific inquiry," *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, __U.S.__, 130 S.Ct. 1605, 1633 (2010), these questions cannot be answered in the abstract. The outcome necessarily will depend on the unique facts and circumstances of each case, *Liautaud*, 221 F.3d at 987; *Outsource Intern., Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999); *Cambridge Engineering, Inc.*, 378 Ill.App.3d at 447, 879 N.E.2d at 522, and "[a]pplication of the legitimate-business-interest test will not produce the same result in all cases." *Reliable Fire Equipment Co.*, 405 Ill.App.3d at 735, 940 N.E.2d at 174.

Whether there is a legitimate business interest and whether the means chosen are necessary and reasonable are matters of proof the law allocates to the party seeking the clause's protections – here, Pampered Chef. *Integrated Genomics, Inc. v. Kyrpides*, 2010 WL 375672, 8 (N.D.Ill. 2010). Pampered Chef's attempts to meet that burden are based largely on *Arpac Corp. v. Murray*, 226 Ill.App.3d 65, 76, 589 N.E.2d 640, 649-650 (1st Dist. 1992). There, the defendant's contract had a non-solicitation or "non-inducement" clause that prohibited him, for two years following the conclusion of his tenure with the plaintiff, from "induc[ing] or attempt[ing] to induce, any employees, agents or sales personnel of Arpac to terminate any relationship with Arpac." 226 Ill.App.3d at 69, 589 N.E.2d at 645.

The defendant, who was plaintiff's vice president of marketing and sales, had engaged in "flurry of activity" immediately after his departure geared toward inducing one of plaintiff's salesmen and two specialists to leave the company. In affirming the trial court's grant of injunctive relief, the appellate court said:

> [b]ecause it appears that the covenant restricting the solicitation of Arpac's employees was reasonably calculated to protect Arpac's interest in maintaining a stable work force, we find that this portion of the restrictive covenant was enforceable and not void.

226 Ill.App.3d at 76, 589 N.E.2d at 650.

Pampered Chef contends that its encompassing non-solicitation clause is valid because such a clause was approved in *Arpac*. The defendants argue that the maintenance of a stable work force is not a legitimate business interest under Illinois law, and that *Arpac* was wrongly decided. Neither of these polar, absolutist positions is accurate, and Pampered Chef's literal reading of *Arpac* is contrary to the basic principles that inform the reading of judicial opinions.

Statements in judicial opinions are not parsed as though we were dealing with the language

of a statute, and general expressions and ultimate holdings must be read in light of the subject under consideration and the facts of the case.  *See United States v. Skoien,* 614 F.3d 638, 640 (7th Cir. 2010)(*en banc*); *All-Tech Telecom v. Amway Corp*., 174 F.3d 862, 866 (7th Cir. 1999).  "[I]t is a disservice to judges and a misunderstanding of the judicial process to wrench general language in an opinion out of context." *Aurora Loan Services, Inc. v. Craddieth,* 442 F.3d 1018, 1026 (7th Cir. 2006). *See also  East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705 (7th Cir. 2005)("Although we stated in *Panoramic* that damages would not adequately remedy a permanent loss of jobs...that language must be read in context.");*United States v. Gerke Excavating, Inc.*, 412 F.3d 804, 808  (7th Cir. 2005); *Colon v. Option One Mortgage Corp*., 319 F.3d 912, 920 (7th Cir. 2003).

That *Arpac* was not intended as a general validation of every clause that prohibited the non-solicitation of all employees is apparent from its recognition of the critical role the facts and circumstances of the case play in evaluating the necessity for and reasonableness of a restrictive covenant: "Enforceability of a restrictive covenant in an employment contract is dependent [the court said] on whether, given the particular facts of the case, the restraints imposed thereby are reasonably necessary for the protection of the employer's business from unfair or improper competition." 226 Ill.App.3d at 75, 589 N.E.2d at 649.  In *Arpac*, the critical facts related to the employees' specialized skills, strong relationships with long-time customers, and the very limited number of competitors in a highly specialized and competitive market.  226 Ill.App.3d at 74, 589 N.E.2d. at 648.

The defendants' rejection of *Arpac* is based on what they see as an absence of analysis by the court.  While *Arpac's* ultimate conclusion finds expression in a single sentence, there is a good

deal more to the opinion than the defendants are willing to concede. As noted above, *Arpac* was mindful of and stressed the central role played by the facts of each case: Arpac manufactured sophisticated and complex shrink-wrap packaging machinery. Arpac's sales to distributors comprised 80% to 85% of its total sales, with the balance of sales to end users. Of those distributors, the top 30 to 40 had an association with Arpac from three years to ten or more years, the average being five years. Because of the complexity of choosing the proper machinery, it took from six months to five years from the time a quote is first received until the machinery is installed at the customer's work place. During that time, Arpac and its distributors determined, in cooperation with the customer, the type of features suitable to that customer's needs. The shrink wrap packaging business in the United States, in which Arpac competed, consisted of fewer than ten other manufacturers of machinery, and comprised less than one percent of the total packaging industry. 226 Ill.App.3d at 67-68, 589 N.E.2d at, 64. It was, in short, a highly specialized and highly competitive market with few players, all competing for the business of a small number of customers.

Following his departure from Arpac, the defendant enticed away Arpac's senior salesman, who had been with the company for ten years, Arpac's production manager, and its electrical foreman, who had been with the company for thirteen years. 226 Ill.App.3d at 70, 589 N.E.2d at 646. These employees played an essential role in Arpac's operations and in the "special relationship" it had with its customers. It was in this context that the court concluded that the maintenance of a stable work force was a legitimate business interest, and it is in this context that its holding must be understood.

The importance of these facts to *Arpac*'s analysis and ultimate holding is further evidenced

by *Arpac*'s reliance on *Torrence v. Hewitt Associates*, 143 Ill.App.3d 520, 493 N.E.2d 74 (1st Dist. 1986). There, the restrictive covenant prohibited the plaintiff, a lawyer with a particular specialty, from working for a competitor of his employer following his termination of employment, from soliciting work from or performing work for one of his former employer's clients and from attempting to hire the former employer's employees. The court found that the employer had a protectible interest because the former employee "occupied a position of trust and confidence," possessed unique skills, and had access to "confidential information of a sensitive nature" like financial data, future business plans, client lists, confidential reports." 143 Ill.App.3d at 527, 493 N.E.2d at 78.[13]

Recently, *Integrated Genomics, Inc. v. Kyrpides*. 2010 WL 375672, 10 (N.D.Ill. 2010)(Lefkow, J.) held that *Arpac* was an accurate statement of Illinois law, and that "employers have a legitimate interest in preventing the solicitation of their employees by a former coworker." The employees in that case were highly skilled and highly specialized – "world experts in microbial genomic analysis and metabolic reconstruction." 2010 WL 375672, 10. Given the limited pool of competent replacements, the loss of the employees would have had a significant and detrimental impact on the employer. Similar concerns underlay *Malone v. CORT Furniture Corp.*, 2002 WL 1874819 (N.D. Ill. 2002)(Zagel, J.). CORT was "a small company where many of its employees perform key functions," and the loss of even a small number would impact the company adversely. In this context, the court found *Arpac* instructive and concluded that CORT had a legitimate business

---

[13]*Arpac* also relied on *Frank B. Hall & Co., Inc. v. Payseur*, 78 Ill.App.3d 230, 232, 396 N.E.2d 1246, 1248 (1st Dist. 1979), which upheld the validity of a nonsolicitation clause that prohibited inducing remaining employees to leave the plaintiff's employ.

interest in maintaining a stable workforce and granted a temporary restraining order against Malone, enforcing an 18-month prohibition against solicitation or hire of CORT's employees.

**b.**

The defendants' contention that *Arpac* has largely been rejected is inaccurate. (*Defendants' Response*, at 12). The cases do not constitute a blanket rejection of the principle that maintenance of a stable work force can never be a legitimate and protectible business interest. Indeed, with one exception, the pertinent cases either explicitly or by necessary implication recognize that under Illinois law, a restrictive covenant that prohibits solicitation of employees may be enforceable. Whether it is will depend on the facts and circumstances of the particular case and the scope and duration of the clause. There can be no *a priori* answer.

For example, *YCA, LLC v. Berry*, 2004 WL 1093385 (N.D.Ill. 2004)(Leinenweber, J.) refused to hold that *Arpac* was wrongly decided. The court found highly instructive *Pactiv Corp v. Menasha Corp.*, 261 F.Supp.2d 1009, 1014 (N.D.Ill. 2003)(Holderman, J.), which held that the plaintiff had a protectible interest in not having the defendant hire away at least some of its management level employees. Although *Pactiv* involved an employer-to-employer contract, the court found that *Arpac* did, indeed, have a role to play in the analysis. 2004 WL 1093385, 17. Ultimately, as in *Pactiv*, the court concluded that the covenant was overbroad and not sufficiently tailored to protect the plaintiff's legitimate interest in ensuring that its confidential information remained within its control. Indeed, the court found the covenant "absurd[ ]" since it would prevent the former employee from recruiting even a janitor to work as a postal carrier in Somalia. *Id*. at 17.

*Hay Group, Inc. v. Bassick*, 2005 WL 2420415 (N.D.Ill. 2005) does not reject the legitimacy of an employer's interest in maintaining a stable work force. Had it done so, it would have been

unnecessary to reach the question of the necessity for and reasonableness of the prohibition against soliciting *any* employee of the plaintiff or its worldwide affiliates. Rather, the case would have been decided on the basis that maintenance of a stable work force is not an interest recognized under Illinois law, and that would have been the end of the matter. The court, however, invalidated the clause because of its overbreadth: it was a "blanket prohibition" on soliciting any Hay employee, including the plaintiff's "janitorial staff." 2005 WL 2420415, 7.

The only case cited by the defendants that expressly rejects *Arpac* and adopts the principle that under no circumstances can a covenant prohibiting a former employee from soliciting remaining at-will employees be enforced is *Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977 (C.D.Ill. 2003), which called *Arpac* a "misapplication of Illinois law." *Id*. at t 983. It held that the only legitimate business interests that could support a restrictive covenant in Illinois were protection of near-permanent customer relationships and confidential information or trade secrets. *Id*. Concluding that Illinois Appellate Court decisions are not binding, the court in *Unisource* refused to follow *Arpac* and chose instead to follow *Schmersahl, Treloar & Co. v. McHugh*, 28 S.W.3d 345, 351 (Mo.Ct.App.2000), which held that under *Missouri law,* an employer's interests in protecting the stability of its "'at-will work force is not one of the interests which may be protected by a restrictive covenant....'" *Id*. at 983 n.2. Consequently, *Unisource* held that the restrictive covenant at issue was invalid insofar as it prohibited post-employment competition and solicitation *or hiring* of plaintiff's employees.

There are several objections to preferring *Unisource* and *McHugh* to *Arpac.* First, district court cases are not binding precedent. *Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 573 (7th Cir. 2009). Second, while decisions from the Illinois Appellate Court are not binding, they are persuasive

authority, *Adams v. Catrambone*, 359 F.3d 858, 862 (7ᵗʰ Cir. 2004); *AAR Aircraft & Engine Group, Inc. v. Edwards,* 272 F.3d 468, 470 (7ᵗʰ Cir.2001), and should be followed in the absence of "a 'compelling reason' to believe that they have stated the law incorrectly." *Adams*, 359 F.3d at 862; *AAR Aircraft,* 272 F.3d at 470. The decision of an intermediate Missouri court applying Missouri law is not a compelling reason to reject an Illinois Appellate Court case applying Illinois law..

Third, in 2001, two years before *Unisource* was decided, the Missouri Legislature passed a statute that effectively abrogated *McHugh* by permitting non-solicitation clauses of employees. *See Morrow v. Hallmark Cards, Inc.,* 273 S.W.3d 15, 28 (Mo.App. 2008). Mo.Rev.Stat.§ 431.202.1 provides that "[a] reasonable covenant in writing promising not to solicit, recruit, hire or otherwise interfere with the employment of one or more employees shall be enforceable and not a restraint of trade" if it is between an employer and a non-clerical or secretarial employee, and does not continue for more than one year following the termination of employment. Section 431.202.2 further provides that the reasonableness of a covenant "shall be determined based upon the facts and circumstances pertaining to such covenant, but a covenant covered exclusively by subdivision (3) or (4) of subsection 1 of this section shall be conclusively presumed to be reasonable if its postemployment duration is no more than one year." Under the statute, a non-solicitation clause is valid even if confidential or trade secret information or customer or supply relationships are not implicated.

Fourth, Illinois protects at-will employment relationships from unjustifiable interference. *See supra* at 21-22. *Unisource*'s and *McHugh*'s flat rejection of the protectability of an at-will relationship through a restrictive covenant is inconsistent with Illinois's prohibition against tortious interference with such a relationship. Fifth, and perhaps most importantly, a year after *Unisource* was announced, the Illinois Supreme Court decided *H & M Commercial Driver Leasing, Inc. v. Fox*

*Valley Containers*, 209 Ill.2d 52, 805 N.E.2d 1177 (2004). While the case did not decide the precise question here, it is a significant indicator of what the Supreme Court will do when that question comes before it. The facts were: The plaintiff was in the business of leasing truck drivers and related personnel. It entered into an agreement with the defendant to furnish licensed drivers. The contract provided that Fox Valley would not hire any of the leased personnel for a period of one year from the termination date of the agreement. (That would likewise prohibit any solicitation efforts toward that end). The contract contained a liquidated damages provision in the event of a breach by the defendant. Fox Valley hired one of the leased drivers, and the plaintiff sued, invoking the restrictive covenant.

Stressing that the validity of a restrictive covenant is dependent on the facts and circumstances of the case, the Illinois Supreme Court held that the clause was valid, and that it was not an unreasonable restriction on the freedom of contract of members of the public. The court relied on the Virginia's Supreme Court's decision in *Therapy Services, Inc. v. Crystal City Nursing Center, Inc.*, 239 Va.385, 389 S.E.2d 710 (1990), which upheld a clause that prohibited nursing home customers from hiring the providers' employees. The Virginia Supreme Court held that the restraint was reasonable and that the "provider has a legitimate interest in maintaining professional personnel in its employ – without such a clause the provider would become an 'involuntary and unpaid employment agency.'" Concluding that *Therapy Services, Inc* "provides the most guidance with respect to the case at bar," 209 Ill.2d at 62, 805 N.E.2d at 1183, the Illinois Supreme Court found the covenant constituted a reasonable way to protect the company's "legitimate interest" in insuring

against dissipation of its work force, its sole business asset. 209 Ill.2d at 64, 805 N.E.2d at 1184.[14]

While the court did not cite *Arpac*, its holding that a business has a legitimate interest in maintaining professional personnel in its employ – at least under certain circumstances – is sufficiently similar to *Arpac's* conclusion that maintenance of a stable work force is a legitimate business interest that it cannot be said that *Arpac* is not an accurate statement of Illinois law. To the extent that *Unisource* refused to validate a restrictive covenant that prohibited post-employment hiring of former employees, it is at best difficult to reconcile with *H & M.*. It is also difficult to perceive a principled difference between the interest deemed legitimate in *H & M* and that in *Arpac*. It does not matter whether one calls the interest "maintaining professional personnel in [one's] employ" or "maintaining a stable work force."

### c.

If any consensus can be gleaned from the cases discussed above, it is that the interest in maintaining some stability within an employer's work force can be a legitimate business interest. In this, as in other contexts, the facts and circumstances will vary and will determine the necessity for and reasonableness of the restrictions imposed by the employer to protect that interest; blanket prohibitions will seldom be deemed necessary or reasonable. *See YCA*, 2004 WL 1093385, 17-18; *Hay Group*, 2005 WL 2420415, 7, *PactivCorp.*, 261 F.Supp.2d at 1014 -1015. The party seeking

_____

[14] Calling its 60,000 consultants and Directors its "number one asset," *see infra* at 38, does not make the case comparable to *Therapy Services, Inc.* or validate Pampered Chef's non-solicitation clause. As Justice Holmes long ago cautioned, "[w]e must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889). It can be said of any business that its number one asset is its workforce. Without people, a company is lifeless. Under Pampered Chef's theory, any company would be entitled to require any of its employees to sign the kind of non-solicitation agreement that exists here. No case remotely supports such an argument or such a result. And Pampered Chef's own counsel conceded as much during the oral argument on the motion. *See infra* at 47.

the protection of the covenant must show that it imposes restrictions no greater than are necessary to protect the particular interest at stake. *See supra* at 23.

The plaintiffs in cases like *Hay Group* and *PactivCorp* were concerned with the obvious risks associated with the loss to competitors of employees with confidential information. In that context, even the defendants concede that an appropriately tailored, non-solicitation clause is a permissible device to protect a legitimate business interest. And *Arpac*, despite its broad reference to maintaining a stable work force, and its approval of the particular clause involved in that case, involved a specialized and stable workforce – which is not the situation here.

Pampered Chef does not argue that it "manufactures sophisticated, expensive machinery, which requires a great deal of time and expense to market" and that it has to depend on a loyal, stable customer base, cultivated by sophisticated salespeople. *See Arpac*, 226 Ill.App.3d at 74, 589 N.E.2d at 648. It does not argue that its consultants and Directors are made up of highly educated individuals, with specialized expertise, whose numbers are limited, like the "world experts in microbial genomic analysis and metabolic reconstruction" in *Integrated Genomics*, 2010 WL 375672, 10. On the contrary, Pampered Chef takes anyone willing to participate in its direct sales model. Its instructional materials urge current salespeople to draw their recruits from fellow alumni, friends and acquaintances from church, school, clubs, and social groups. (*Def.Rsp.*, Ex. H, at 6). This includes not only family and friends, but others known to the latter and so on *ad infinitum.* Neither skill nor background nor education nor highly specialized training are required.[15]

With nearly 60,000 at-will salespeople who come and go annually with metronomic

---

[15] (*Def.Rsp.*, Ex. H, at 12) ("It's important for [you] to get beyond [your] circle of friends . . . [Tell your friends] the best way [they] can help [you] is to invite people [you] don't know mutually. [Tell your friends to] think about who [they] know that [you] don't know.").

regularity, Pampered Chef cannot be likened to the "small company," where many of its employees perform[ ] key functions," as in *CORT Furniture*, 2002 WL 1874819, 1.  And, unlike the situation in *YCA*, *Hay Group*, and *Pactiv,* Pampered Chef does not claim that the non-solicitation clause is necessary to protect confidential information.  In short, there is nothing in Pampered Chef's business operations that is remotely comparable to those situations that have been held to warrant a carefully tailored non-solicitation of employees clause  to protect an employer's interest in what may loosely be called maintenance of a stable work force.

### d.

Obviously, "maintenance of a stable work force" – the business interest that is the basis for Pampered Chef's expansive, non-solicitation covenant – requires a work force that is stable in the first instance or at least one whose stability will likely result from the restrictive covenant.  The evidence presented in support of and in opposition to the motion for preliminary injunction shows the  inherent instability of Pampered Chef's work force.  Pampered Chef annually experiences massive turnover of its sales people.  In each of the years 2008 and 2009, Pampered Chef lost 50% to 60% of its consultants.  Yet, each year, those leaving were readily replaced.  (*Def.St.*, ¶ 3;Ex. A, Tr. at 632:22-633:22).  And all were replaced in the same time frame.   In just the first nine months of 2010, a little over a third of the consultants left – a total of 20,000, about the same rate as 2008 – but they were replaced with a net gain of 4,000 consultants.  (*Def.St.*, ¶ 3;Ex. A, Tr. at 632:22-633:22).

This substantial turnover is consistent with the exceedingly high turnover rate that has historically characterized the direct sales industry, *see e.g., In the matter of Amway Corporation, Inc.,*

*et al.,* 93 F.T.C. 618 (1979),[16] and continues to this day, reaching as high as 150-200 %. *See* Thomas R. Wotruba, et al., *Differences in Turnover Predictors between Multilevel and Single Level Direct Selling Organizations*, 15 Int. Rev. of Retail, Distribution and Consumer Research, no. 1, Jan. 2005 at 91-110; Robert A. Peterson & Thomas R. Wotruba, *What is Direct Selling? – Definition, Perspectives, and Research Agenda*, 16 Journal of Personal Selling & Sales Management 4, 1-16 (Fall 1996).

Pampered Chef does not claim that the turnover rates for 2008 - 2010 were statistical outliers or that it has or ever had a "stable" work force. Instead, it contends, for the first time in its reply brief, that the high turnover rate is one of the reasons it needs the non-solicitation clause. (*Reply*, at 4).[17] Necessarily *implicit* in this contention is the unarticulated, further contention that without the clause, things would even be worse. But, "[h]ypothesis is not proof," *Lauth v. McCollum,* 424 F.3d 631, 634 (7th Cir. 2005), and "[s]aying so does not make it so." *Spano v. The Boeing Co.,* 633 F.3d 574, 588 (7th Cir. 2011).[18] And, speculation is never a substitute for proof. *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009); *In re Cohen,* 507 F.3d 610, 614 (7th Cir.2007).

Pampered Chef introduced no evidence that without its solicitation clause its turnover rate

---

[16] The *Amway* opinion noted that the average annual turnover of Amway Distributors was about 50%. The turnover rate for Amway distributors during their first year was almost 75%. The annual 1983 turnover rate for companies engaged in direct selling of lower priced products averaged about 100%.

[17] In order to prevent the "sandbagging" that results from belated presentations in reply briefs, issues that could and should have been raised in an opening brief are waived. *Mohamad v. Rajoub,* 634 F.3d 604, 608 (D.C. Cir. 2011). *See also Dexia Credit Local v. Rogan,* 629 F.3d 612, 625 (7th Cir. 2010); *United States v. Boyle,* 484 F.3d 943, 946 (7th Cir. 2007).

[18] The plaintiff's failure to support or develop its tacit contention results in a waiver under the oft-repeated principle that skeletal, unsupported and undeveloped arguments are waived. *MMG Financial Corp. v. Midwest Amusements Park, LLC,* 630 F.3d 651, 659 (7th Cir. 2011); *Long-Gang Lin v. Holder*, 630 F.3d 536, 543 (7th Cir. 2010); *Woolard v. Woolard,* 547 F.3d 755, 760 (7th Cir. 2008).

would be higher than it is. Nor did its expert, Mr. Fleming, testify that nonsolicitation clauses are standard in the industry – as one would expect if, in fact, they were effective in limiting the high turnover rate. Nor did he even testify that in his opinion such clauses serve to curb attrition rates and to keep them from going even higher than they are. These omissions are significant and fatal to Pampered Chef's claim of necessity. *Compare Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").

The second argument advanced by Pampered Chef to justify the non-solicitation clause relates to the monetary resources it says it spends on training its sales people. This argument also was not made until the Reply brief. (*Reply*, at 4-5). Its director of sales training and communications testified at the preliminary injunction hearing that Pampered Chef spends about $2 million annually on training that includes live events around the country and courses available online and through audio, DVD, and print materials. (Ex. 1, Tr., at 561:14-25; 563:3-5). She explained that the investment in training is "extremely important" because when consultants are more skillful, "they do better in businesses," are "more satisfied with the results," and "[t]hey stick with Pampered Chef longer." (Ex. 1, Tr., at 562:15-21). And so, Pampered Chef submits that:

> Without such a [non-solicitation clause] former Directors could actively solicit members of the Pampered Chef's sales force after they have already received a significant amount of costly training in the direct sales business. The result would be that former Directors would unfairly receive the benefit of the substantial training provided by Pampered Chef, without having to incur any of the expense.

(*Plaintiff's Reply*, at 5).

Pampered Chef cites no case in support of its contention that preventing former Directors from receiving the benefit of the training it provides is a legitimate business interest that it can protect

through its non-solicitation clause. One of the two cases it cites in support of the general proposition that maintenance of a stable work force is a legitimate business interest notes the expense the employer would incur in replacing an employee who might be lured away. In *Integrated Genomics,* the employees were biochemists whose replacement would take at least twelve months at a cost of between $30,000 to $40,000 in employee time and recruiter fees. Approximately $76,000 to $100,000 in salaried time would have to be spent before this replacement became profitable. *Integrated Genomics*, 2010 WL 375672, 4. By comparison, assuming Pampered Chef's $2 million figure is accurate, it represents an expenditure of about $34 per employee. This figure may actually be overly generous.[19] And replacement of those leaving occurs quickly and without apparent effort.

Moreover, despite a training program that Pampered Chef's Director of training and communication calls "remarkable" and "extremely important," (Ex. 1; Tr. 562), Pampered Chef has no qualms about other direct sales companies reaping its benefits, since its consultant contracts allow its sales force to work for other direct sales organizations *while* they are working for Pampered Chef. In any event, no case is cited that would support this as a "legitimate business interest."

Under Pampered Chef's view of Illinois law, its nonsolicitation clause is necessary to maintain a stable workforce. But the proof shows that the work force is chronically unstable, and that this instability is common throughout the direct sales industry. And, no proof was offered that the current level of instability would be worse but for the clause.

---

[19] The figure becomes even more inconsequential when it is set against the number of people who pass through Pampered Chef annually. While its consultants generally numbers about 58,000, in 2009, for example, Pampered Chef lost 37,000 consultants and replaced every one of them. That means that 95,000 people went in and out of its fold over the course of that year. That would put the amount spent on training at about $21 a head that year. It should also be noted that the $2 million Pampered Chef spends on training represents 10% of its annual IT budget, and a little more than one-half of 1% of its annual revenue – about $333 million in 2009. (*Def.Rsp.*, Ex. C, at TPC000920; *Defendants' Sur-Reply*, Ex. A, at 48:11-49:18).

**e.**

Pampered Chef has not shown that the scope and two-year duration of its non-solicitation clause are reasonable or necessary. Under the Pampered Chef's contracts with its approximately 58,000 consultants, there is no prohibition against the consultant working simultaneously with any company. Yet, the non-solicitation clause in the Directors' contracts prohibit solicitation of a consultant "to sell products or services other than those sold by [Pampered Chef]...." The non-solicitation clause is of such breadth that a departing Director could not for a two-year period solicit any of the 60,000 individuals who comprise Pampered Chef's sales force – whether Director or consultant – to work for another company, even if not a competitor, and even if the Director did not know that person, the person lived a continent away, and he had no relationship of any kind with that person. Pampered Chef has offered no credible evidence that the breadth of these restrictions are reasonable or necessary. In fact, the evidence points in the opposite direction. We begin with the duration of the clause.

The duration of a restrictive covenant must be reasonably related to the needs of the business. *Liautaud,* 221 F.3d at 988; *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill.2d 52, 78, 866 N.E.2d 85, 99-100 (2006); *Baird and Warner Residential Sales, Inc. v. Mazzone*, 384 Ill.App.3d 586, 591, 893 N.E.2d 1010, 1014 (1st Dist. 2008). For example, in a business where client development takes over a year, a restriction on competition for one to two years is reasonable because of the time it takes to cultivate a client. *Liautaud*, 221 F.3d at 988.

According to Pampered Chef, its clause has a duration of two years because that is how much time it "*feels*" it needs to "rebuild those relationships, answer any questions, redevelop their trust if necessary in the business opportunity" that might result when a Director leaves Pampered Chef.

(*Plaintiff's Amended Memorandum*, at 15; *Pl.St.*, ¶ 10-11);(*Pl.St.*; Ex. 1; Tr., at 581:2-11)(emphasis supplied). This contention rests, in part, on the testimony of Janice Capinegro, Pampered Chef's Consultant, Career Solutions. At the hearing, she explained that:

> We want to make sure that we protect our field. Our field is our number-one asset at The Pampered Chef. And so somebody does choose to leave, which that's fine, we just want to make sure that we have the time, and *we feel* that two years is a very reasonable time, that we can go in, rebuild those relationships, answer any questions, redevelop their trust *if necessary in the business opportunity*. So we can go in and actively work with that team to make sure that they continue to stay strong and try to keep as much of that team intact as possible. After two years, they can do whatever they want.

(*Pl.St.*; Ex. 1; Tr., at 581:2-11)(emphasis supplied).

Things became even more nebulous when Ms. Capinegro tried to say that the harm to Pampered Chef is not so much a matter of lost sales or customer relationships,[20] but in the departing Director's "downline organization and it's in his *sphere of influence*, whether his peers, upline, others that he communicates with"or "had relationships with." *Id.* As explained by Ms. Capinegro, the problem of what Pampered Chef and its expert, Mr. Fleming, describe as broken trust, fractured belief, and broken relationships, *see supra* at 7; *infra* at 39-41, *et seq.,* extends to anyone who was in the departing Directors "sphere of influence"– whatever that may mean – and anyone with whom she communicates. This, of course, leaves the overwhelming number of the 60,000 member salesforce unaffected by the departure of a Director.

Nothing beyond a "feel[ing]" is offered in support of the contention that two years is needed to deal with this speculative situation, and the only specifics that were offered about how Pampered

---

[20] She conceded that the there is no risk of harm to customers since they can order directly from a consultant's website in their area. (*Def.Rsp.*; Ex. E, at 286 *et seq.*). In most, if not all of the cases sustaining a nonsolicitation clause, the loss of the protected employees would affect the customers by depriving the business of those most able to meet the particular need of the customer on an ongoing basis.

Chef dealt with the situation when Directors left in the past show that the remedial efforts can be effectuated in the main within a few days or weeks of the Director's departure. At her deposition – the transcript of which was supplied not by the plaintiff, but by the defendants – Ms. Capinegro said that the Director's downline automatically "rolls up to an upline, that the field really works with area customers, hosts to encourage them to book a show with them." She could not, however, point to anything of any moment or of any complexity or that took any time that was done to rebuild the supposedly fractured belief and trust in the business opportunity and relationships beyond communicating via the Pampered Chef website to the sales field what was happening, and responding to anyone who called in with a question. (*Def.Rsp.*, ¶ 11; Ex. E, Capinegro Dep. at 286:16-23).

Ms. Capinegro testified that when the Directors in this case left, these efforts took the form of using "Excuflash" – apparently a section on the Pampered Chef website (it's never explained) – to communicate to the sales field what was happening and respond to anyone who called in with a question. (*Def.Rsp.*, ¶ 11; Ex. E, Capinegro Dep. at 286:16-23).

Q: Has Pampered Chef done anything to try to ensure that what you just testified occurs with respect to Don Funt's hosts and customers?

A: Just what I said before, just to make sure that our brand and our name is out there and they have easy access.

Q: Nothing beyond that, nothing specific with respect to Don Funt?

A: Correct.

Q: Okay. Now, the bigger harm that you're talking about -- and let me ask you this: If I ask the same questions with respect to Chris Laurich and Sandy Alexanian, it's the same answer, you've done the same types of things with respect to them, nothing specific with respect to them, correct?

A: I would believe so. You know, there was outreach done by the sales department that I didn't have specific conversations, knowledge, you know, connections with them regarding that.

(*Def.Rsp.*; Ex. E, at 286-292).

Ms. Capinegro offered not a single bit of testimony pointing to any instance of "fractured belief, broken trust, or broken relationships" supposedly coming in the wake of the departure of any of the defendants in this case or any other Director at any time in the history of Pampered Chef.

Pampered Chef offered no *evidence* why two years is needed for these claimed rebuilding efforts, and the evidence adduced thus far shows that the efforts described by Ms. Capinegro do not take two years, or even two months. The fact that some cases have approved two years as a reasonable time period does not mean that that time frame is appropriate in all circumstances. There is nothing presumptively reasonable about a two-year period of nonsolicitation, nor could there be, since questions of necessity and reasonableness are fact and context-specific, *Jerman*, 130 S.Ct. at 1633 (2010); *see also supra* at 22-23, thereby precluding any general rule of duration. PartyLite's clause is only for a year, and many other cases involving nonsolicitation clauses do not extend beyond a year. *See e.g., Junction Solutions LLC v. MBS Dev., Inc.*, 2007 WL 4233995, 1 (N.D.Ill. 2007); *Automated Concepts, Inc. v. Weaver*, 2000 WL 1134541, 3 (N.D.Ill. 2000). Where a restrictive covenant or non-solicitation clause is, as here, overbroad, it is unenforceable. *See e.g., YCA, LLC v. Berry*, 2004 WL 109338, 17; *Hay Group*, 2005 WL 2420415, 7; *Pactiv*, 261 F.Supp.2d at 1014-15.

**f.**

Beyond its excessive temporal reach, the clause is also overbroad in that it covers not merely those in the departing Directors' immediate downline, or in his arguable "sphere of influence," to borrow Ms. Capinegro's phrase, but precludes solicitation of any of the approximately 58,000 consultants throughout the country, even though the Director would have had no communication,

relationship or involvement with them and over whom he had no influence and with whom he had no relationship and sharing of trust to be "fractured."

"Activity restrictions, such as restrictions on competing or soliciting, should be narrowly tailored to protect only against activities that threaten the employer's interest." *Reliable Fire Equipment Co.*, 405 Ill.App.3d at 747, 940 N.E.2d at 184 (covenants against competing and soliciting unreasonable because they "apply to all customers of plaintiff, not just those with which Arredondo and Garcia dealt."). *See also YCA LLC v. Berry*, 2004 WL 1093385, 17 (covenant that prohibited recruiting or hiring of any associate at YCA was unenforceable as needlessly overbroad); *Pactiv Corp. v. Menasha Corp.*, 261 F.Supp.2d at 1014 (clause that prohibited hiring any management-level employee of Pactiv overly broad, and thus unenforceable, since it would have sufficed to have prevented the hiring of only some of those employees). *Compare Smith, Barney, Harris Upham & Co., Inc. v. Robinson,* 12 F.3d 515, 517 (5th Cir.1994)(one year non-solicitation clause that "microscopically focused the Agreement at that aspect of Robinson's job that would be most damaging to Smith Barney," namely Robinson's solicitation or inducement of any Smith Barney employee to "resign from either (a) the Smith Barney branch office at which defendant worked or within 50 mile radius enforceable under Louisiana law).

Pampered Chef's justification for the unlimited reach of it nonsolicitation clause is based on the testimony of its expert, John Fleming. In essence, he said that the clause was necessary to prevent what he called "fractured belief, broken trust, and broken relationships" that he tried to say follow in the wake of a Director's departure and that permeate the very fabric of the entire Pampered Chef

organization.[21]  (*Pl.St.*, Ex. 1; Tr. 456:7-16).

At bottom, this is a dressed-up and elaborate way of saying that the morale of many tens of thousands of Pampered Chef salespeople will be affected profoundly whenever a Director leaves to join another company.  Harm to morale and disruption of equanimity are not always and inevitably a basis for finding irreparable harm.  *Compare Seaboard World Airlines, Inc. v. Tiger Intern., Inc,.* 600 F.2d 355, 365 (2d Cir. 1979)("District judges should take arguments of serious harm to a corporation due to jitters in executive suites with a fair amount of salt; the demoralizing effect, if any, would generally be limited to the fairly short period that tender offers usually run.... The uneasiness of a target's management exists in any takeover.").

Mr. Fleming's status as an expert witness was not challenged by the defendants.  But his conclusions were.  But even if they had not been, I cannot "take on faith" whatever [he] claim[ed]." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997).  *See also Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996). The testimony of an expert must rest on a reliable foundation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 589, 597 (1993); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir.1989). An expert who provides nothing but a bottom line supplies nothing of value to the judicial process. *Minasian,* 109 F.3d at 1216.  Mr. Fleming's testimony was "full of vigorous assertion...carefully tailored to support plaintiffs' position but devoid of analysis." *Id.* at 1216. In the final analysis, there are only Mr. Fleming's *ipse dixits*.  And  that is not enough. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)*; Wendler & Ezra, P.C. v. American Intern. Group, Inc*., 521 F.3d 790, 791 (7th Cir.

---

[21]  Given Mr. Fleming's thesis, it is curious that  Pampered Chef's instructional materials do not talk about establishing trust or fostering beliefs. (*Def.Rsp.*, Exs. H, L). There is no reference to anything like that in its pamphlets.

2008); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995)((on remand)( "the expert's bald assurance of validity is not enough").

There is no credible evidence on this record that the presumably diverse, geographically separated members of Pampered Chef's almost 60,000 independent contractors, having little or no direct contact with anyone other than those in their immediate or closely-related downlines, are connected through a network of relationships involving "trust and belief" so that the departure of a Director will cause the pervasive reactions hypothesized by Mr. Fleming. The instant case is not an exception to Justice Brandeis' insight that "the logic of words should yield to the logic of realities." *Desanto v. Pennsylvania*, 273 U.S. 34, 43 (1927).

Notably, Pampered Chef shies away from referring to Mr. Fleming's testimony in its submissions; but here is what Mr. Fleming had to say. To begin with, when asked to explain what appeared to be a shibboleth, he said that his "broken trust, fractured belief, and broken relationships" thesis is "very difficult sometimes to explain, because the business becomes very complex." (Tr. 452). He went on to say that in a direct sales company like Pampered Chef, all of the sales people are independent consultants, not employees. Each is effectively running his or her own business and trying to bring in others below them, and they in turn will hopefully bring in additional consultants and so on, and so on. From this he concluded: "...you take any one of these individuals, obviously they are buying into a trust factor...." (Tr. 455). Why that is so, he never adequately explained.

Mr. Fleming's explanation for how thousands upon thousands of independent sales consultants spread throughout the country could be involved in some intricate and interrelated web of mutual "trust," and how the departure of a Director in one part of the country could affect the claimed interrelationships between every one of the 60,000 people was not credible and was

speculative:

> Q: What do you mean the impact extends beyond the people below this one consultant?
> A: Yeah. You don't know who *might* be looking at this and feeling: Wow, my organization is one that I believe in. And *if* the same thing happens in my organization, what happens to me? So you get the ripple effect of negativity.

(*Def.Rsp.*, Ex. 1; Tr. 456:24-457:1-4)(emphasis supplied).

And this "ripple effect of negativity," he maintained, extends throughout "a whole organization [which] becomes vulnerable to whatever the decisions might be up here.":

> *So now you get broken trust. You get broken relationships. You get fractured belief.* And you have all of these things going on within the organization *possibly* as well as outside of the organization [i.e. the Director's downline], because the other organization [i.e. other downlines not that of the Director who is leaving] is just like this one that are a part of ABC. So everyone begins to look at what's going on. And the impact, I usually describe it as being residual. It's hard to quantify, because the impact extends beyond the people themselves.

(Tr. 456)(Emphasis supplied). What this means, Mr. Fleming never explained. [22]

Beyond saying that this and his other conclusions were based on his "knowledge of the industry,'' (Tr. 479), Mr. Fleming gave no examples that would have supported or elucidated his opinion. Of course, because an expert may be qualified by experience to be a witness, Rule 702, Federal Rules of Evidence, does not mean that experience, standing alone, is a sufficient foundation rendering reliable any opinion the expert may express. *United States v. Frazier,* 387 F.3d 1244, 1261 (11th Cir.2004). When expert testimony is primarily based on the experience that the expert has

---

[22] I do not credit Mr. Fleming's testimony, which is not adequately supported or explained and is, at best, highly exaggerated. Even in Star Wars, it took the destruction of a planet to create "a great disturbance in the Force , as if millions of voices suddenly cried out in terror, and were suddenly silenced." And it took no less a Jedi Knight than Obi-Wan Kenobi to sense it.

gained through personal endeavors, the expert "must explain how that experience leads to the conclusion reached...and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga,* 398 F.3d 426, 432 (6th Cir.2005). *See also Insignia Systems, Inc. v. News America Marketing In-Store, Inc*. 2011 WL 167259, 5 (D.Minn.2011)("Although...one can opine based upon experience...such testimony must also explain how the experiences lead to the conclusion that is reached and why that experience is a sufficient basis for the opinion [and]...the expert must explain how that experience is reliably applied to the facts.").

The Advisory Committee Note to the 2000 Amendments to Rule 702 make the point: "[I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." The trial court's gatekeeping function – here the trial court's evaluative function – requires more than simply 'taking the expert's word for it." If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

When asked, "when people who have these relationships of trust leave, how does that impact hosts and the customers that came through those hosts?," Mr. Fleming replied:

> Well, I think the fabric of trust and belief and relationships and the extension of caring to individuals who come from all walks of life, who have to typically learn a skill they did not know, it all becomes so important, because if those things are not strong, the business model really does not work.

Mr. Fleming has had a life-long career in the direct sales industry.  Yet, despite having been involved in that industry since 1969, (Tr. 434), he could not give a single, specific, instance of the kind of "ripple effect  of negativity" or broken trust and fractured belief that he hypothesized could exist if a consultant or Director anywhere in the country learned of the departure of a Director

anywhere else in the country, and if he or she ruminated about their place in the organization. Mr. Fleming never performed any tests, studies, surveys, or interviews to determine the impact a Director's leaving might have on Pampered Chef (or any other direct sales organization) or on consultants or Directors who are left behind. He expressed no view on whether the claimed "ripple effect of negativity" depended on whether the Director left on his own, retired, or died, rather than being lured away through a prohibited solicitation. (*Def.Rsp.*, ¶ 9; Ex A. Tr. 485:5-15). *See Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994)(rejecting expert testimony where expert could not provide testimony on examples of particular instances to support the conclusions).

Mr. Fleming said he did not know of any published studies performed by any company to determine what, if any impact, Directors leaving might have. (*Def.Rsp.*, ¶ 9; Ex A. Tr. 485:5-15). While he thought that individual companies "always take a close look at that," Pampered Chef, itself, produced no studies, analyses, or even informal assessments of its own operations and its institutional experience with the effects of the departure of a Director for another direct sales company.

It should be noted that Mr. Fleming's contentions are inconsistent with those of Ms. Capinegro, who testified at her deposition that the harm from a Director's departure – what Mr. Fleming, called the ripple effect of negativity – affects those within the Director's "sphere of influence" – not the entire 60,000 person sales force, as Mr. Fleming contended.

Mr. Fleming first said that it would take perhaps 150 to 200 people leaving in "a matter of months" for there to be broken trust, fractured belief, and broken relationships. He quickly retrenched and thought maybe 50 or 60. (*Def.Rsp.*, ¶ 9; Ex. A, Tr. 474:25-473:21). Ms. Capinegro, however, testified that when the Directors involved in this case left Pampered Chef, their remaining "downlines" were assigned to the Director at the next level up in the organization, (*Def.Rsp.*, ¶ 9; Ex.

A, Tr. at 606:17-607:16), thereby negating any claim that the departures in this case interrupted the company's operations and its ability to service customers. There was absolutely no evidence offered by Mr. Fleming or Pampered Chef that the departure of the several Directors in this case had any tangible or meaningful impact on the operations of the Pampered Chef or on the morale of those left behind.

At the oral argument, Pampered Chef's counsel attempted to analogize Mr. Fleming's broken trust, fractured belief, and broken relationships hypothesis to the emotions members of a symphony orchestra experience when their conductor leaves to go elsewhere. Quite apart from the fact that there was no evidence offered on the reactions that members of an orchestra might feel upon a change of conductors, the evidence does not remotely begin to support the comparison. A more apt comparison is the effect of the departure of an executive of a large corporation on the remaining employees. Pampered Chef's counsel conceded that the departure of a highly placed General Motors executive would not produce a "ripple of negativity" among those remaining with the corporation, and he conceded that a non-solicitation clause that would bar the departing officer from soliciting *anyone* who was employed by GM could not pass muster under Illinois law.

In the end, neither Mr. Fleming nor Pampered Chef's briefs do anything more than repeat the unilluminating phrase, "broken trust, fractured belief, and broken relationships." But a tidy and rigid formula cannot solve problems whose solutions require careful attention to the unique facts and circumstances of each case. That is precisely what is required when the validity of a restrictive covenant is at issue. *Liautaud*, 221 F.3d at 987; *Outsource International, Inc. v. Barton & Barton's Staffing Solutions*, 192 F.3d 662, 666 (7th Cir. 1999); *Cambridge Engineering, Inc.*, 378 Ill.App.3d at 447, 879 N.E.2d at 522.

In sum, there is no credible evidence at this stage of the case that the business model employed by Pampered Chef involves and depends on some ineffable concept of trust and belief that is uniquely susceptible to being "fractured" merely because a Director or other highly placed person at Pampered Chef leaves to go to another company. And there is no credible evidence that the effects Mr. Fleming hypothesized would occur or could affect even the tiniest fraction of the 60,000 members of the Pampered Chef sales force. On the present record, the plaintiff has not demonstrated that its nonsolicitation clause is necessary and reasonable and thus has not shown a likelihood of prevailing on the merits.

But even if Mr. Fleming is right and those who are independent contractors with a direct sales company are bound together in a way that actual employees of other large companies are not – and thus are susceptible to the comings and goings of their fellows (even if they have never met them) – Pampered Chef has still not, at this stage, shown that it is likely to prevail on the merits. The question that Mr. Fleming did not answer and for which there is no answer in the record, is whether without Pampered Chef's nonsolicitation clause, Pampered Chef's attrition rate would be meaningfully higher? For if it would not be, there is not a justification for the restraint, especially given its unlimited reach and two-year duration. A restrictive covenant that serves no purpose cannot be said to be in the public good or to be reasonable or necessary.

### g.

It is not a sufficient answer to say that Pampered Chef's non-solicitation clause is an insignificant and permissible restraint on trade because the Directors are not prohibited from working anywhere else, but are only prevented from soliciting remaining Directors and the 58,000 independent contractors/consultants. If that argument were dispositive, no case would ever reach the

question of the necessity for and reasonableness of a non-solicitation of employees clause. Yet, all the cases recognize the centrality of that inquiry and are based on its answer.

Beyond this, the clause may be more restrictive than it appears on its face and may inhibit a departing Director's ability to move to another direct sales company. Like Pampered Chef, these companies are pyramid organizations, which emphasize the importance of bringing others into the fold and building an organization beneath them. Directors are made not by sales volume, but by recruits or downlines. This raises the question of how marketable a Director is when he or she leaves Pampered Chef, but is prohibited from soliciting any of the thousand who remain at the company.

Everyone has a limited universe of those who can readily be called upon and enticed to join a direct sales organization. Pampered Chef's own instructional materials recognize the limited source provided by one's family, friends and acquaintances and urge their consultants to ask those in one's immediate circle to approach others outside that circle. (*Def.Rsp.*, Ex. H, at 6; 12). Chances are someone who has made the Director level is "tapped out;" she's approached all the people she knows who are viable candidates. When she leaves, the non-solicitation clause requires that she find a whole new source of individuals to recruit. Thus, in practical application, the non-solicitation clause has at least some restraining effect on the departing Director's appeal to a new company.

In sum, Pampered Chef has not made a clear showing that it has some likelihood of succeeding on the merits with regard to the validity of its non-solicitation clause. While under appropriate circumstances Illinois law recognizes clauses that bar the solicitation of employees, Pampered Chef has not shown that its clause is reasonable and necessary. "[N]o other interest has been established in the record beyond plaintiff's desire to shield itself from ordinary competition." *Reliable Fire Equip. Co.,* 405 Ill.App.3d at 736, 940 N.E.2d at 175.

**2.**

### Ms. Pell's and Ms. Mitchell's Awareness of the Non-Solicitation Clause
### In The Pampered Chef Contracts

**a.**

Even if Pampered Chef had carried its burden to show the enforceability of its clause, there can be no viable tortious interference with contract claim unless it can show that Ms. Mitchell and Ms. Pell knew of the clause. Pampered Chef concedes that it has no evidence that they did. Instead, it stakes its claim on "constructive" or imputed knowledge, based on the defendants' combined, long experience in the direct sales industry – 45 years for Ms. Mitchell and 12 for Ms. Pell. (*Pl.St.*, ¶ 34; Tr. 534:8-11) – and their contracts with their current and prior employers, which are said to have non-solicitation clauses.[23] (*Plaintiff's Amended Memorandum*, at 16). Pampered Chef also contends that because recruits have asked about the impact of their own agreements on their freedom to join Park Lane, Ms. Pell was "on notice of the existence of such contracts in the direct selling industry." (*Plaintiff's Amended Memorandum*, at 17). Finally, noting that Ms. Mitchell said that whether a recruit has an agreement with another company is "irrelevant," Pampered Chef contends that the defendants "do[n't] care about The Pampered Chef's – and others' – contractual relationships with their sales force." (*Plaintiff's Amended Memorandum*, at 18).

---

[23] The non-solicitation provision in Park Lane's agreement reads:

From the date of this Agreement until one year following termination of this Agreement [regardless of the reason for the termination], Director shall not, either directly or indirectly, either for him/herself or for any other person, firm, or corporation, call upon solicit, divert, or take away any of the company's employees or Independent Contractors.(*Pl.St.*, Ex. 12).

For the proposition that this is enough to prove constructive knowledge, Pampered Chef cites, without discussion, one case – *D 65, Inc. v. Berry's Inc.*, 955 F.Supp.2d 908 (N.D.Ill. 1997). There, a manufacturer of porcelain figurines brought a tortious interference with contract claim against a retailer of those items. The manufacturer distributed its wares through authorized dealers, who signed a policy agreement in which they agreed not to sell the figurines to other retailers or wholesalers – a practice called "transhipping." *Id.* at 911. The defendant retailer was not an authorized dealer, but had purchased the items from one. In response to the manufacturer's motion for summary judgment, the retailer claimed it had no knowledge of the policy agreement the manufacturer had with the authorized dealer that was the source of the retailer's figurines. *Id.*

The evidence produced in the summary judgment proceeding suggested otherwise: the manufacturer's attorney sent the offending retailer a letter informing it of the no-transhipment agreement and warning that continued unauthorized acquisition would constitute the inducement of the dealers to breach their contract and "wrongful interference in our business relationship with them." *Id.* at 912, 916. Additionally, the manufacturer undertook a widely publicized reward campaign to encourage reporting of transhipping, and the retailer was a member of a national limited edition dealer association and received its newsletter. That newsletter "contained express admonitions against transhipment of products subject to no transhipment provisions, and threatened offenders with termination of their association membership," and there was a specific warning regarding the manufacturer's figurines. Finally, the retailer admitted it was aware of provisions against transhipping in the industry. Little wonder that the district court rejected the retailer's argument that it lacked constructive knowledge of the transhipment prohibition in the authorized dealer's agreement.

The retailer premised its position on the fact that when it received the manufacturer's attorney's letter, it requested, but never received, a copy of the agreement; and that it was not required to take the attorney's word for it. *Id*. at 916. The court held that the letter was sufficient to put the retailer on notice of the authorized dealer's agreement, citing Restatement (2d) Torts, §766, Comment i, for the proposition that a "defendant's subjective belief regarding the effect of the contract does not dispel defendant's knowledge of the contract." *Id.* at 916. Comment i explains that "it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty.... If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have." The court held that when the letter was considered with the substantial other evidence bearing on knowledge, a reasonable jury could conclude that the retailer knew of an agreement between the manufacturer and its authorized dealers and that the agreement prohibited authorized dealers from transshipping the figurines to unauthorized dealers. *Id*. at 916.[24]

The evidence adduced thus far does not approach that in *D65* or support the conclusion that Ms. Pell and Ms. Mitchell had sufficient knowledge of the relevant facts to be charged with knowledge of the non-solicitation clause in the Directors' contracts. That evidence shows that they signed agreements with Park Lane that had non-solicitation clauses. In Ms. Pell's deposition,

---

[24] In addition to cases from other jurisdictions, the Comment cites *Bolger v. Danley Lumber Co., Inc.*, 77 Ill.App.3d 207, 211, 395 N.E.2d 1066, 1069 (1st Dist. 1979),which quotes Professor Prosser for the proposition that "intentional interference 'presupposes knowledge of the plaintiff's interests, or at least of facts which would lead a reasonable man to believe in their existence.'"

Pampered Chef's counsel asked Ms. Pell if she "knew . . . that independent sales consultants in direct selling organizations always get and sign *some form* of consultant or independent consultant sales agreement as a condition of getting a kit from those direct selling organizations. . . ." (*Pl.St.*, Ex. 6, Pell Dep., at 60:10-16(emphasis supplied)). Ms. Pell said she "just kn[e]w of Park Lane's agreement and PartyLite's." (*Pl.St.*, Ex. 6, Pell Dep., at 60:18-19). She said she assumed, but didn't "know for a fact," that other companies "have *an* agreement." (*Pl.St.*, Ex. 6, Pell Dep., at 61:4-6)(Emphasis supplied).

But knowledge of "some form" of independent sales contract does not mean the contract has a non-solicitation clause of any sort, let alone one with the provisions contained in the Pampered Chef contracts. Pampered Chef has all of its sales people sign "some form" of an agreement, but somewhere on the order of 95% of those agreements *do not* include a non-solicitation clause.

It is also significant that Mr. Fleming, Pampered Chef's expert, despite his long experience in the direct sales industry, never testified that all direct sales companies had non-solicitation clauses in their contracts. All he said was that "virtually all of the direct selling companies with which [he was] familiar utilize *some form* of independent contractor agreement for their independent sales force. . . ." (*Pl.St.* , ¶ 7; Ex. 1, Tr. 447:25-448:4 (emphasis supplied)). The fact that PartyLite and Park Lane have nonsolicitation clauses does not even begin to prove that such clauses are standard in the direct sales industry, and that as a consequence, Ms. Pell and Ms. Mitchell must have known that the defendant Directors' contracts with Pampered Chef had such a clause.

Pampered Chef's points to a complaint in the Eastern District of Missouri by PartyLite, charging a former salesperson – not Ms. Pell – with violating the company's confidentiality clause to recruit salespeople from PartyLite to Park Lane. (*Reply*, Ex. 3, ¶¶34-35). Ms. Pell is alleged to

have pitched the Park Lane opportunity to a number of recruits at a barbecue. This, according to Pampered Chef "belies any argument that Pell or Mitchell . . . had no knowledge of non-solicitation clauses used by other direct sales companies." (*Reply*, at 13). This document and argument, like a number of other arguments, were first raised in the Reply brief. The argument is thus waived. *Blanco v. Prudential Insurance. Co. of America*, 606 F.3d 399, 402 (7th Cir. 2010); *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 360 (7th Cir. 1987). Apart from waiver considerations, the argument is unpersuasive.

 If the complaint is offered to prove the truth of the matters asserted, the most that can be said is that PartyLite had a restrictive covenant that prohibited the use of confidential information to recruit PartyLite sales force to join another company. (*Plaintiff's Reply*, Ex. 3). That would not suffice to show that Ms. Pell can be charged with constructive knowledge either of *Pampered Chef's* non-solicitation clause or that such clauses were, in fact, standard throughout the direct sales industry. Moreover, the Missouri complaint was filed on August 23, 2010, almost six months *after* the instant complaint. Consequently, even assuming Ms. Pell had read the complaint – which Pampered Chef does not contend – the Missouri complaint, itself, cannot constitute notice to Ms. Pell at the time of the conduct involved in this case that Pampered Chef had a restrictive covenant in its contract.

The evidence regarding Ms. Mitchell's knowledge of the non-solicitation clause in the Pampered Chef Director's agreements is similarly sketchy and uncertain. She, too, has worked for two direct sales companies, Tupperware and Park Lane. She admitted that she signed written agreements with both, and that she actually signed a second Tupperware agreement when she was promoted. (*Def.Rsp.*, ¶ 34). She testified that she knew that her Park Lane agreement had a non-solicitation clause, but did not know if her Tupperware agreement did. (*Pl.St.*, Ex. 8, Mitchell Dep.,

54

at 340-40).  The evidence shows only that Ms. Pell and Ms. Mitchell know that one company, Park Lane, has an agreement with a non-solicitation clause.  While there was evidence that there was "some form" of an agreement utilized in the direct sales industry, there was no evidence that such agreements typically contained non-solicitation clauses.  Thus, on the present record, and given the arguments advanced in the briefs, even if one were to reject Ms. Pell and Ms. Mitchell's claims not to have known what was in their prior employer's contracts, they cannot be constructively charged with knowledge of the non-solicitation clause in the Directors' contracts with Pampered Chef.[25]

**b.**

Although it is not entirely clear, Pampered Chef seems to argue that Ms. Pell and Ms. Mitchell had a duty to learn the terms of each recruit's previous contracts, and if they did not, they are charged with what they could have learned.  It contends that Ms. Mitchell never asks recruits about the terms in their agreements with other companies, and that Ms. Pell testified that when someone asks her whether their contracts precluded them from working with Park Lane, she tells them that she does not know because she does not know their contract.  (As noted earlier, her testimony was that *if* someone asked – and she thought that someone probably did although she could not recall –  she would say that she could not give an opinion because she did not know what their contract said).

Unless Illinois law imposes some duty of inquiry, there is nothing tortiously wrong with either

---

[25] "Willful blindness" is a form of constructive knowledge and can be equivalent to actual knowledge. *In re Aimster Copyright Litigation,* 334 F.3d 643, 650 (7th Cir. 2003)(copyright law). Pampered Chef, however, does not make the argument that "willful blindness" can and should apply in the context of an intentional interference with contract case. The term appears nowhere in its briefs. There is a reference to Pell and Mitchell being "willfully ignorant" of the existence of the Pampered Chef contracts.  But no "willful blindness" case is cited The only Illinois case cited (and that without any elaboration or discussion) deals with constructive knowledge under the Restatement.  Judges ought not to make arguments for lawyers or go beyond the briefs. *See Fabriko Acquisition Corporation v. Prokos,* 536 F.3d 605, 609 (7th Cir. 2008); *Kay v. Board of Educ. of City of Chicago,* 547 F.3d 736, 738 (7th Cir. 2008); *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir.1995); *LINC Hartmann v. Prudential Ins. Co. of America,* 9 F.3d 1207, 1214 (7th Cir. 1993).

Ms. Pell's or Ms. Mitchell's stance on the subject. Pampered Chef has cited no pertinent authority imposing such a duty under Illinois law.[26] Notably, Pampered Chef encourages new salespeople to recruit their co-workers from past or current jobs. (*Def.Rsp.*, ¶ 31; Ex. H, at 6). There is no accompanying caution regarding any non-solicitation clause to which the recruits might be subject. And Pampered Chef is an Illinois corporation, *Complaint ¶6,* which presumably abides by Illinois law. If Illinois law imposed the kind of duty it now contends should have governed Ms. Mitchell and Ms. Pell's interactions with new recruits, presumably questions would be asked about the recruits' contracts with their current employers. But that is not what Pampered Chef does.

At her deposition, Ms. Capinegro testified that Pampered Chef undertakes no investigation or inquiry as to whether a new recruit is subject to a non-solicitation clause or any type of agreement at all. (*Def.Rsp.*, ¶ 32; Ex., at 120:4-11). Jean Jonas, Pampered Chef's senior vice president of sales, testified that recruits weren't questioned because it was assumed they were "there in good faith to hear about our product and the opportunity, they can sit in there, again in good faith." (*Def.Rsp.*, ¶ 32; Ex. B, at 186:7-17). The evidence then is that if the duty that Pampered Chef now espouses exists, is not adhered to by Pampered Chef.

While Pampered Chef's conduct in this regard is not, itself, proof of Illinois law, it is not without relevance since Pampered Chef is seeking equitable relief. The "unclean hands" doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the

---

[26] Pampered Chef cites *Burns v. Hy-Vee, Inc.*, 2003 WL 21303185, 8(D.Minn. 2003) for the proposition that "knowledge of sufficient facts which, if followed by a reasonable inquiry, would have led to a complete disclosure of the contractual relations and the rights of the parties" is sufficient. (*Plaintiff's Amended Memorandum*, at 16). But Minnesota law is inapplicable since the parties have agreed that Illinois law governs. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991)("when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). *Accord Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009).

matter in which he seeks relief, however improper may have been the behavior of the defendant."

*ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 329-30 (1994). The doctrine applies "when there is a direct nexus between the bad conduct and the activities sought to be enjoined." *International Union, Allied Industrial Workers v. Local Union No. 589,* 693 F.2d 666, 672 (7th Cir.1982). The Seventh Circuit explained the required connection in *Shondel v. McDermott*, 775 F.2d 859 (7th Cir. 1985):

> If [the supervisor] had threatened to fire workers under him who supported the challenger, . . . unclean hands might bar [the supervisor] from getting an injunction against being fired for his political activities on [his candidate's] behalf. He would be asking for protection against the very wrong he had inflicted on his subordinates, and to give him that protection would encourage the kind of wrongdoing that he was seeking to enjoin, and would therefore be a perverse use of judicial resources.

775 F.2d at 869. Here, Pampered Chef wants to preclude a company from conducting business the way Pampered Chef – and perhaps every direct sales firm – does. There is a tinge of unclean hands. This is an argument that the defendants only allude to by pointing out the inconsistencies between Pampered Chef's arguments here and its conduct in the marketplace.

Not even the Direct Sales Association code of ethics, which Pampered Chef sought to rely on at the evidentiary hearing, imposes a duty of investigation. Nor does it prohibit solicitation, as Mr. Jonas testified it did. (*Pl.Rsp.*, ¶ 32;Ex. 1,Tr. 581:18-582:2). According to the Direct Sales Association website:

> It is considered to be an improper practice when Company A, or its representatives, specifically and consciously targets the salesforce of Company B with the intent of persuading Company B's salespersons or employees *not only* to sell or work for Company A, *but also to cease selling or working for Company B*, thereby interfering with Company B's business or contractual relations. This is not intended to encompass the occasional incident or two, but it does apply to situations involving more than several persons, where the pattern, approach and timing of Company A would clearly indicate an intention to adversely impact on Company B. If Company B sends correspondence to Company A regarding alleged proselyting activity,

> Company A is expected to appropriately respond within 30 days after receipt of the correspondence. (Emphasis supplied).

http://www.dsa.org/ethics/proselyting/.

It is not that "proselyting" is prohibited, just that its frowned upon when there is a combination of pattern, approach, and timing that clearly indicate an intent to cause the recruit to sever his or her current association. While the code's prohibitions would apply to Directors since they cannot work simultaneously for another direct sales company, they would have no application to Pampered Chef consultants, who are allowed to have multiple affiliations. Of course, an association's code of ethics "cannot dictate the manner in which restrictive covenants should be construed in Illinois," *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill.2d 52, 67, 866 N.E.2d 85,94 (2006).

Not controlling here, because it is a Wisconsin case, but perhaps instructive is *Gruen Industries, Inc. v. Biller*, 608 F.2d 274 (1979), which, applying Wisconsin law, allowed liability for tortious interference to be based on constructive knowledge. *Id.* at 283. The Seventh Circuit "decline[d] to dilute the intent requirement of this tort by imposing an affirmative duty of inquiry on the part of a potential purchaser whenever it has knowledge of slight circumstantial evidence of a contract with a competitor." The court noted that "[t]he Wisconsin decisions have not expanded liability this far, no doubt partly because the creation of such a duty of inquiry could give parties considerable power to intimidate their competition, even in the absence of a valid contract." *Id.* There is nothing to suggest that Illinois law is different or that the court of appeals would dilute the intent requirement under Illinois law.

**3.**

**Intentionally "Inducing" A Breach Of The Directors' Contracts**

The third element of a tortious interference with contract claim requires that the defendant intentionally induced a breach of the contract. If Ms. Pell and Ms. Mitchell did not have actual or constructive knowledge of the Directors' contracts with their non-solicitation clauses, they could not have acted intentionally to induce a breach. But we proceed as though the element of knowledge were sufficiently shown.

"[T]he element of 'inducement' in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another." *R.E. Davis Chemical Corp. v. Diatonic, Inc*., 826 F.2d 678, 687 (7th Cir. 1987), *modified on other grounds*, 924 F.2d 709 (7th Cir. 1991). There must be "'some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'" *Cohen v. Lewis*, 2004 WL 2481015, 6 (N.D.Ill. 2004)(quoting *In re Estate of Alberto,* 275 Ill.App.3d 439, 446, 656 N.E.2d 97, 103 (2nd Dist.1995)); *Francorp, Inc. v. Siebert*, 2000 WL 1741918, 4 (N.D.Ill. 2000). It is not enough that the defendants "merely created a condition that opened the way for the [the employees] to breach their contracts." *Cohen,* 2004 WL 2481015, 7.

The evidence shows that Ms. Pell and Ms. Mitchell explained to the defendant Directors the money-making benefits of the Park Lane plan and the financial rewards that could result were others to join Park Lane – which the defendants probably already knew because Pampered Chef does the same thing. Although the evidence does not show that they told the former Directors to give them names of Pampered Chef Directors or consultants, it certainly can be inferred that Mitchell and Pell anticipated that names would be forthcoming. But as the Seventh Circuit has stressed, knowledge that one's conduct is certain to result in a breach of contract is not enough. *R.E. Davis Chemical*

*Corp.*, 826 F.2d at 687.

Pampered Chef argues that "[i]t is simply not credible for Mitchell and Pell to deny having instructed anyone to provide names and contact information of The Pampered Chef's sales force members...that on a lark and without prodding each of the former Director defendants spontaneously gathered the names of The Pampered Chef's most successful sales force members and sent them to Ms. Mitchell and Ms. Pell." (*Plaintiff's Reply*, at 15-16). When any incident is considered in isolation, it may not justify any particular inference, let alone a negative one. But when a number are taken together, it is often the case that they cannot be dismissed as mere coincidence and may constitute convincing evidence. *United States v. Rodriguez*, 975 F.2d 404 (7th Cir. 1992). The principal is one of ancient vintage and common sense. *Coggeshall v. United States,* 69 U.S. 383 (1865); *In re Elm St. in City of New York*, 246 N.Y. 72 (1927) (Cardozo, C.J.)("If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous.").

The defendant Directors did not provide the names to Pell and Mitchell on a lark or spontaneously, and Pell and Mitchell do not argue they did. The evidence thus far shows that the names were given in response to and after Pell and/or Mitchell explained how attractive and lucrative the Park Lane's program was. It is not implausible that if someone is told of a plan where they get a commission on their recruits' sales – like Park Lane's *or* Pampered Chef's – she or he would need no explicit request to provide names of those likely to generate substantial sales.

The evidence at this juncture is in equipoise. Where there are two equally credible versions or interpretations of the facts the court should be highly cautious in preferring one to the other and granting an injunction without the benefit of a full trial. *Lawson Products, Inc. v. Avnet, Inc*., 782

F.2d 1429, 1440 (7th Cir.1986). Thus the plaintiff has not shown a reasonable likelihood of demonstrating that Pell and/or Mitchell induced the Directors to breach their contracts.[27]

**C.**

**Irreparable Harm/Inadequate Remedy At Law**

Even if Pampered Chef had demonstrated a likelihood of success on the merits, it would still have to show that without injunctive relief, it is "likely" to suffer irreparable harm for which there is no adequate remedy at law. *Winter*, 129 S.Ct. at 375. The "'possibility' standard is too lenient. Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is *likely* in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the Court's characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Id.* *See also Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 945 (7th Cir. 2006)(district court erred by not requiring "persuasive showing of irreparable harm.").

Pampered Chef submits that the irreparable injury it will suffer – and has already suffered – if a preliminary injunction does not issue takes the form of the "broken trust-fractured-belief-broken relationships" about which Mr. Fleming testified. Pampered Chef likens this to a "loss of goodwill, competitive position, and relationships." The difficulty is that Mr. Fleming's testimony regarding the claimed "ripple of negativity" throughout the length and breadth of Pampered Chef's almost

---

[27] As for the fourth element, breach of contract by the former Directors, the defendants do not dispute that the former Directors breached their agreements by providing names of recruits from Pampered Chef to Ms. Pell and Ms. Mitchell. (*Defendants' Response*, at 22). But this is only assuming – and this is definitely disputed – the non-solicitation clause is enforceable.

60,000-member salesforce is unconvincing and insufficient to show that Pampered Chef will suffer an irreparable injury without injunctive relief. And there is no proof that Pampered Chef's competitive position has been or is likely to be compromised without an injunction. The same is true of its goodwill contention.

Pampered Chef reliance on *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools*, 420 F.Supp.2d 866 (N.D.Ill. 2006) does not require a different result. There, a diamond saw blade salesman was terminated by plaintiff for "embezzlement of millions of dollars worth" of plaintiff's product: diamond-tipped saw blades. *Id.* at 869. Immediately thereafter, he began selling and distributing diamond-tipped saw blades for plaintiff's competitor, soliciting orders directly from plaintiff's customers and seeking to employ individuals who were employed by the plaintiff at the time he was terminated. *Id.* The court concluded that that the plaintiff had no adequate remedy at law and would suffer irreparable harm without an injunction, because if "defendants [were] allowed to continue to pilfer [plaintiff's] customers and employees, [plaintiff] will lose goodwill, competitive position, and continuity of business relationships with its customers and employees. Such harm is oftentimes fatal to businesses, and cannot be readily calculated and cured by an award of monetary damages." *Id.* at 872.

Perhaps because this case is so dissimilar from *Diamond Blade*, Pampered Chef merely cites the case and leaves it at that. Park Lane is not a competitor of Pampered Chef, and there is no competitive position to be lost. Mr. Fleming said that it would take the loss of 200 people – he then changed the number to 50 or 60 – before there would be fractured belief and broken trust. Even that lesser number has not been approached here, and there is no proof or claim of continuing activities by Ms. Pell and Ms. Mitchell. The loss of 17 people out of almost 60,000 to Park Lane over a two-

year period does not constitute a loss of "continuity of business relationships with [Pampered Chef's] customers and employees," or of customer goodwill.[28]  Nothing in Ms. Capinegro's testimony showed that a single customer was adversely affected or even inconvenienced by the departure of the defendants in this case or the departure of any Director at any time in Pampered Chef's history. There is absolutely nothing in this record to sustain a claim that Pampered Chef's goodwill amongst its customers has been or will be affected.

Far more relevant than the district court's opinion in *Diamond Blade* is the Seventh Circuit's decision in *Lawson Products, Inc.*, *supra.*  There, the plaintiff lost 7 of its 800 employees to the defendant.  The court held that the lost profits were not invariably incalculable, and that the plaintiff had not shown irreparable harm or inadequate remedy at law. *Id.* at 1440.  The court found significant the minimal numbers of affected employees and sustained the denial of preliminary injunctive relief:

> Second, the relative degree of past injury does not indicate that Avnet's activities can result in a serious undermining of Lawson's sales force, at least not during the period between the denial of the motion and trial. Avnet contacted fifty-seven of the eight hundred Lawson salespeople, seven of whom actually left. Under the theories of liability presented by Lawson, tortious interference with contractual and business relationships, there is no actionable wrong in the absence of an actual breach....Thus the extent of Lawson's injury from the raid, apart from such intangibles as trade secrets or goodwill, is the loss of seven salespeople. While it may be that Lawson can ultimately establish the wrongfulness of Avnet's actions and Lawson's entitlement to an injunction, where the past injury indicates a very limited threat of future harm during the pre-trial period *and* the record is ambivalent as to the merits of the dispute the district court is within its discretion to deny the preliminary injunction.

782 F.2d at 1441.

---

[28] Courts often find a loss of goodwill and accompanying irreparable harm in cases of trademark or trade dress infringement. *See, e.g., AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir.2001);*Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994). Neither is a part of Pampered Chef's case.

Mr. Fleming said that avoidance of fractured belief broken trust was not an end in itself, but rather, the key to "profitability." (*Pl.St.,* Ex. 1, Tr. 474:3-21):

> So I think that you're going to lose some belief, and you're going to lose some trust, and you're going to lose some productivity. And if people don't stay committed to go out and sell and service customers and share the opportunity with other people, which leads to recruitment, training, and development of others, that's really an emotional piece of the business, and my experience is when people feel good about their business and the way business is conducted, they go out and do that very well. When they don't feel good, they don't go out and perform the same way.

(*Def.Rsp.,* Ex. A, Tr. 480:23-481:7).[29] The idea that happy and contented workers do better and achieve more than those who were not is not a new concept or one whose articulation required an expert. This aspect of Mr. Fleming's testimony does not support the plaintiff's attempt to justify the scope and duration of its restrictive covenant.

Nor does *Allison v. CRC Insurance. Services, Inc.*, 2010 WL 2523208 (N.D.Ill. 2010). There, the court held that most of the damages to the movant were quantifiable, but that "[i]t would be virtually impossible to quantify the damage to goodwill, loss of reputation, and impact on the remaining [movant's] employees that has resulted from the loss of the over 120 . . . employees and the alleged breaches of contracts." 2010 WL 2523208, 6. "Not only does ordinary business not continue, but there is the additional upset and uproar that accompanies such a large loss of employees." 2010 WL 2523208, 7. Notably, these employees were brokers who left on the same day to work for a competitor founded by the movant's former co-president. Also, those 120 brokers

---

[29] Suppose there is a woodshop with several woodworkers. One is a true artisan. His pieces are top of line, and fetch the best prices. More than that, he is a mentor to the other woodworkers. If he is wooed away by a competitor who did not have the right to do so, there is an adverse impact. Now, one can say that there is no way to quantify the master's *skill*, but the end result – the economic damage– is clearly identifiable in the woodshop's lost profits. There's a monetary remedy for the loss of the master-craftsmen.

constituted 15 % of the movant's workforce. 2010 WL 2523208, 1. Under these circumstances, which do not exist here, the court found irreparable harm and an inadequacy of the remedy at law.

Pampered Chef would have to lose 8,700 salespeople to Park Lane to approach that rate of attrition. Instead, over the course of a few years, just 13 Directors – of an original 3000 or so – have left to join Park Lane, and 4 consultants out of some 58,000 joined Park Lane. Significantly, according to the testimony of Pampered Chef's expert, Mr. Fleming, the loss of so infinitesimally small a proportion of the sales force would not result in a "broken trust-fractured-belief-broken relationships" problem. It will be recalled that his original estimate was that 150 to 200 people would have to leave. Even his immediate revision to 50 to 60, *see supra* at 46, has not been met here.

While Pampered Chef's opening brief went no further than reciting Mr. Fleming's fractured and broken trust-belief-relationships trinity and citing *Diamond Blade* to show it would suffered irreparable harm without an injunction, its reply brief added arguments that could and should have been raised in its opening brief. It stated that Ms. Jonas testified that "when a person is stolen by improper raiding by another direct sales company, as Mitchell and Pell did here, [Pampered Chef is] basically required to shut down a store." (*Plaintiff's Reply*, at 17; Ex. 3, Jonas Dep., at 269:20-270:4). But all l "shutting down a store" means, according to Ms. Capinegro, is rolling that business into an upline, which is what Pampered Chef did in this case, without any adverse consequences to the customers or others involved. (*Def.Rsp.*, Ex., Tr. 474:25-475:21). Beyond that, Pampered Chef refers to the money it spends on training. (*Plaintiff's Reply*, at 17). But, as has been seen, that's rather easily quantifiable at between $21 and $34 dollars per-person, per-year.

The upshot of all this is that Pampered Chef has not clearly demonstrated that it is likely to suffer irreparable harm without a preliminary injunction or that it has no adequate remedy at law.

As discussed earlier, the fractured trust and broken relationships that Mr. Fleming posited stemmed from a Director's departure ultimately manifests itself in lost sales. Mr. Fleming called it the "key to profitability," and Ms. Capinegro testified that the net effect of lost Directors is lost sales. (*Def.Rsp.*, ¶ 11; Ex. E, Capinegro Dep. at 287:14-292:6; 292:15-24; 293:1-15). But lost sales can be quantifiable and remedied with an award of damages.

It would not seem particularly difficult to calculate lost sales in this case. Pampered Chef knows the identities of the 13 Directors and 4 consultants who left to join Park Lane, and it knows the dates on which they began with Park Lane and when they left Pampered Chef. It has detailed records of those in their immediate downline and the identities of everyone at each succeeding level. It also knows the amounts of sales generated by each individual at any point in time and whether there was a decline in sales after he or she joined Park Lane. It would not appear to be complicated to compare the sales records before the departure of the 17 individuals with the sales levels after their departure. It is Pampered Chef's burden to demonstrate that it is likely to suffer irreparable harm. Even viewing the evidence in a light most favorable to Pampered Chef, at best, it's no better than a toss-up, and that is not the clear showing that is required.

## D.

### The Tortious Interference With Economic Advantage Claim

Finally, there is the claim for tortious interference with prospective economic advantage. (Complaint, Count V, ¶207, *et seq.*). Under Illinois law, the elements of a tortious interference claim are: "'(1) [the plaintiff's] reasonable expectation of entering into  a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful and unjustified interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business

relationship; and (4) damages to the plaintiff resulting from such interference.'" *Botvinick v. Rush University Medical Center*, 574 F.3d 414, 417 (7th Cir. 2009); *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill.App.3d 849, 862, 893 N.E.2d 981, 993 (1st Dist. 2008).

While a tortious interference claim does not require that there be a subsisting contract and can be applied to at-will relationships, *Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007); *Speakers of Sport, Inc. v. ProServ, Inc*. 178 F.3d 862, 865 (7th Cir. 1999), Pampered Chef's Complaint and its briefs nonetheless explicitly link this claim to the validity of the nonsolicitation clause in its contracts with the Directors.

The Complaint charges that Pampered Chef had a reasonable business expectancy of ongoing sales by its salesforce to its current and former customers, and that Pell and Mitchell wrongfully interfered with that expectancy by "inducing the breach of valid and enforceable agreements between the Pampered Chef and the former Directors, and other members of the Pampered Chef's sales force...."(¶ 211). In other words, the non-solicitation clause.[30]

Pampered Chef's briefs also link the "reasonableness" of its expectations of ongoing relationships with its Directors and consultants and customers to the non-solicitation clause. The argument begins with the assertion that its expectation of a continuing business relationship with its Directors "was reasonable, even in the absence of an enforceable contract." (Amended Memorandum at 15). But the brief then inconsistently goes on to say that the reasonableness "is established in part

---

[30] In Illinois, the terms tortious interference with prospective economic advantage, business expectancy, and business relations are interchangeable. *James v. Intercontinental Hotels Group Resources, Inc.*, 2010 WL 529444, 3 (N.D.Ill. 2010).

by the number of resources invested into promoting and maintaining the individual business of The Pampered Chef's Directors....*in exchange for their promise not to solicit members of The Pampered Chef sales force upon leaving the company*." (*Amended Memorandum* at 15)(emphasis supplied). Given Pampered Chef's own theory, if the non-solicitation clause is not valid, its expectation of a continuing relationship with the Directors was not reasonable.

Lawful competition does not constitute unjustifiable interference. *Speakers of Sport, Inc*., 178 F.3d at 865; *Chicago's Pizza, Inc*., 384 Ill.App.3d at 864. And absent the non-solicitation clause, the Directors admittedly were free to solicit anyone they pleased and to provide the names of potential recruits to Ms. Pell and Ms. Mitchell, who could use the information to advance the business interests of Park Lane. In other words, without a valid non-solicitation clause there would have been no "unjustified tampering," *Chicago's Pizza, Inc*., *supra*, and thus no viable claim for tortious interference with economic advantage. *See also Dowd & Dowd, Ltd. v. Gleason*, 352 Ill.App.3d 365, 816 N.E.2d 754 (1st Dist. 2004)(interference with business relationships or expectancy requires "some impropriety."). There would only have been "[t]he process known as competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort...but on the contrary provides a defense (the "competitor's privilege) to the tort of improper interference." *Speakers of Sport, Inc*., 178 F.3d at 865. *See also Miller v. Lockport Realty Group, Inc.*, 377 Ill.App.3d 369, 376, 878 N.E.2d 171, 178 (1st Dist. 2007)("'The privilege to engage in business and to compete allows one to divert business from one's competitors generally as well as from one's particular competitors....'").

Perhaps recognizing the futility of its argument, Pampered Chef's brief spends only three sentences in support of its "valid expectation" contention. In any event, given the complaint and the

arguments advanced in Pampered Chef's briefs, the discussion of the interference with contract claim applies equally here.

Count V alleges that Pampered Chef has lost "ongoing" and "continued" sales. (¶¶ 209-210). This would appear to be a loss that is compensable in monetary damages.  Finally, for the reasons discussed with regard to the adequacy of the legal remedy in connection with Count IV, Pampered Chef has not clearly shown that it has no adequate remedy at law under Count V.

The plaintiff's Motion for Preliminary Injunction is denied.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 7/14/11